# 12-4437-cv

# United States Court of Appeals
## for the
## Second Circuit

———— ◆❙◆ ————

SLEEPY'S, LLC,

*Plaintiff-Appellant,*

— v. —

SELECT COMFORT WHOLESALE CORPORATION, SELECT COMFORT
RETAIL CORPORATION, SELECT COMFORT CORPORATION,

*Defendants-Appellees.*

—————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT

TANNENBAUM HELPERN SYRACUSE
 & HIRSCHTRITT LLP
900 Third Avenue
New York, New York 10022
(212) 508-6700

*Attorneys for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Appellant hereby certifies that Sleepy's, LLC is a Delaware limited liability corporation. Sleepy's, LLC's member is HMK Intermediate Holdings LLC, a Delaware limited liability company, whose member is HMK Mattress Holdings LLC, a Delaware limited liability company. The corporate members of HMK Mattress Holdings LLC are Sleepy's Holdings LLC, CCP IV Holdings, LLC, CXV Holdings, LLC and CCP IV SBS Holdings, LLC, all of which are Delaware limited liability companies. No publicly held corporation owns 10% or more of Sleepy's, LLC, directly or indirectly.

# Table of Contents

**Page**

Table of Contents ........................................................................................ i

Table of Authorities ................................................................................. iv

JURISDICTIONAL STATEMENT ........................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ........................... 2

BRIEF OF PLAINTIFF-APPELLANT ..................................................... 3

STATEMENT OF THE CASE .................................................................. 3

    A.        The Nature of the Case ............................................... 4

    B.        The Proceedings and Disposition Below ..................... 6

STATEMENT OF FACTS .......................................................................... 7

    The Parties and their Businesses .................................. 7

    The Retail Partner Relationship ................................... 7

    Select Comfort's Representations to Sleepy's Concerning the Personal Preference Line ...................... 10

    Negotiation of the Retail Partner Agreement ............. 11

    Select Comfort's Message to its Own Sales Force Concerning Sleepy's .................................................. 12

    Sleepy's Vigorously Promoted the Select Comfort Beds, but Sales were Consistently Disappointing ............... 13

    Sleepy's Uncovers the Pattern of Disparagement and Defamation of Sleepy's and the Select Comfort Beds it Sold ........... 14

Select Comfort's Advertising and Promotional Materials
Disseminated the Brand Standards Manuals' Message that
Wood was Inferior to Plastic as a Foundation Material ............................. 18

Sleepy's Presents the Shop Report Evidence to Select Comfort ............... 20

SUMMARY OF THE ARGUMENT ................................................................. 22

ARGUMENT ................................................................................................. 25

I.      THE DISTRICT COURT ERRED IN DISMISSING
        SLEEPY'S UNFAIR COMPETITION CLAIM ............................. 25

II.     THE DISTRICT COURT ERRED IN DISMISSING
        SLEEPY'S CONTRACT CLAIMS ................................................. 32

        A. The Terms of the Retail Partner Agreement Applied
        Throughout the Parties' Business Relationship ......................... 33

        B. The Evidence Supported Sleepy's Claim for Breach of the
        Covenant of Good Faith and Fair Dealing .................................. 40

        C. The Evidence Supported Sleepy's Claim for Breach of the
        Non-Disparagement Provision of the Agreement ...................... 41

        D. The District Court's Construction of the "First Quality"
        Provision of the Agreement was Erroneous ............................... 42

III.    THE DISTRICT COURT ERRED IN DISMISSING
        SLEEPY'S SLANDER *PER SE* CLAIMS ...................................... 46

        A. Consent is not a Valid Defense to Sleepy's Slander
            Claims ........................................................................................ 46

        B. A Direct, Specific Attack on Sleepy's Integrity is
        not a Non-Actionable "Loose, Figurative or Hyperbolic"
        Statement .................................................................................... 51

IV.   THE DISTRICT COURT'S INCONSISTENT AND
      ERRONEOUS EVIDENTIARY RULINGS MATERIALLY
      PREJUDICED SLEEPY'S AND REQUIRE A NEW TRIAL........ 55

      A. Erroneous Exclusion of Customer State of Mind
         Evidence ............................................................................... 57

      B. Erroneous Exclusion of Shop Recordings ............................. 62

CONCLUSION ...................................................................................... 65

# Table of Authorities

**Cases**          **Page**

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*,
650 F.3d 876 (2d Cir 2011)................................................................ 26

*Bolander v. Bolander*,
703 N.W.2d 529 (Minn. Ct. App. 2005) ............................................. 34

*Callahan v. A.E.V., Inc.*,
182 F.3d 237 (3d Cir. 1999)........................................................... 60, 61

*Cherne Contracting Corp. v. Marathon Petroleum Co.*,
578 F.3d 735 (8th Cir. 2009) ............................................................. 34

*Costantino v. David M. Herzog, M.D., P.C.*,
203 F.3d 164 (2d Cir. 2000) .............................................................. 56

*Dickson v. Slezak*,
73 A.D.3d 1249, 902 N.Y.S.2d 206 (3d Dep't 2010) ......................... 49

*Dillon v. City of New York*,
261 A.D.2d 34, 704 N.Y.S.2d 1 (1st Dep't 1999) .............................. 51

*Dynamic Air, Inc. v. Reichhold, Inc.*,
No. 05-CV-0955, 2007 U.S. Dist. LEXIS 57651 (D. Minn. Aug. 7, 2007)......... 34

*Electrolux Corp. v. Val-Worth, Inc.*,
6 N.Y.2d 556, 190 N.Y.S.2d 977 (1959) ....................................... 30, 31

*Eveleth Taconite Co. v. Minn. Power & Light Co.*,
301 Minn. 20, 221 N.W.2d 157 (1974)........................................... 37, 46

*Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.*,
408 F.3d 460 (8th Cir. 2005)......................................................... 34-35

*Fischer v. Pinske*,
309 Minn. 202, 243 N.W.2d 733 (1976)............................................ 34

iv

*Fishoff v. Coty Inc.,*
634 F.3d 647 (2d Cir. 2011) ................................................................. 40

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.,*
111 F.3d 993 (2d Cir. 1997) ................................................................. 60

*Global Seafood Inc. v. Bantry Bay Mussels Ltd.,*
659 F.3d 221 (2d Cir. 2011) ................................................................. 33

*Hall v. Bed Bath & Beyond, Inc.,*
No. 2011-1165, 2011-1235, 2013 US App. LEXIS 1995,
(Fed. Cir. Jan. 25, 2013) ...................................................................... 29

*Hawes Office Sys., Inc. v. Wang Laboratories, Inc.,*
524 F. Supp. 610 (E.D.N.Y. 1981) ....................................................... 38

*Herman Schwabe, Inc. v. United Shoe Mach. Corp.,*
297 F.2d 906 (2d Cir. 1962) ................................................................. 60

*Huizenga v. Am. Int'l Auto. Dealers Ass'n.,*
No. 1:05cv264(JCC), 2005 U.S. Dist. LEXIS 30972,
(E.D. Va. Nov. 22, 2005) ...................................................................... 37

*ITC Ltd. v. Punchgini, Inc.,*
9 N.Y.3d 467, 850 N.Y.S.2d 366 (2007) .............................................. 26

*Kivel v. WealthSpring Mortgage Corp.,*
398 F. Supp. 2d 1049 (D. Minn. 2005) ................................................ 40

*LeBreton v. Weiss,*
256 A.D.2d 47, 680 N.Y.S.2d 532 (1st Dep't 1998) ............................ 49

*Lee v. BSB Greenwich Mortgage Limited Partnership,*
267 F.3d 172 (2d Cir. 2001) ................................................................. 43

*Lewis v. Rahman,*
147 F. Supp. 2d 225 (S.D.N.Y. 2001) .................................................. 37

*LinkCo, Inc. v. Fujitsu Ltd.*,
230 F. Supp. 2d 492 (S.D.N.Y. 2002) ................................... 29

*Manning v. New York Univ.*,
299 F.3d 156, (2d Cir. 2002) ............................................. 43

*Mencher v. Chesley*,
297 N.Y. 94, (1947) ......................................................... 53

*Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp.*,
199 Misc. 786, 101 N.Y.S.2d 483 (Sup. Ct. N.Y. County 1950)......................... 29

*Millea v. Metro N. R.R. Co.*,
658 F.3d 154 (2d Cir. 2011) ......................................... 26, 47

*In re Morgan*,
181 B.R. 579 (Bankr. N.D.Ala. 1994) ................................. 38

*Otal Invs. Ltd. v. M/V Clary*,
673 F.3d 108 (2d Cir. 2012) ............................................. 44

*Park v. Lewis*,
139 A.D.2d 961, 528 N.Y.S.2d 250 (4th Dep't 1988) ............................ 48, 49, 50

*Penn Warranty Corp. v. DiGiovanni*,
10 Misc. 3d 998, 810 N.Y.S.2d 807 (Sup. Ct. N.Y. County 2005)...................... 52

*Regscan, Inc. v. Brewer*,
No. 04-6043, 2007 U.S. Dist. LEXIS 20087 (E.D. Pa. Mar. 16, 2007).............. 60

*Rejent v. Liberation Publ'n., Inc.*,
197 A.D.2d 240, 611 N.Y.S.2d 866 (1st Dep't 1994)........................... 53

*Roy Exp. Co. Establishment v. Columbia Broad. Sys., Inc.*,
672 F.2d 1095 (2d Cir. 1982) ............................................. 26

*Sec. Mut. Cas. Co. v. Luthi*,
303 Minn. 161, 226 N.W.2d 878 (1974) ............................... 40

*Standard & Poor's Corp. v. Commodity Exch., Inc.*,
683 F.2d 704 (2d Cir. 1982) ................................................................. 26

*Teichner v. Bellan*,
7 A.D.2d 247, 181 N.Y.S.2d 842 (4th Dep't 1959) ....................................... 48, 49

*Tesser v. Bd. of Educ.*,
370 F.3d 314 (2d Cir. 2003) ................................................................. 56

*United States v. Figueroa*,
548 F.3d 222 (2d Cir. 2008) ................................................................. 56

*United States v. Hamilton*,
334 F.3d 170 (2d Cir.) *cert. denied* 540 U.S. 985 (2003) .............................. 62, 63

*United States v. White*,
692 F.3d 235 (2d Cir. 2012) ................................................................. 56

*Upper Midwest Sales Co. v. Ecolab, Inc.*,
577 N.W.2d 236 (Minn. Ct. App. 1998) ..................................................... 37

*Wells v. Belstrat Hotel Corp.*,
212 A.D. 366, 208 N.Y.S. 625 (1st Dep't 1925) .......................................... 49

*Zervos v. Verizon N.Y. Inc.*,
252 F.3d 163 (2d Cir. 2001) ................................................................. 56

## Statutes

Fed. R. Civ. P. 52(c) .......................................................................... 2, 3, 6
Fed. R. Evid. 803(3) ..................................................................... 55, 59, 60, 61
Fed. R. Evid. 901(a), (b)(1) ................................................................. 62, 63

## Other Authorities

8 Dunnell Minn. Digest Contracts § 8.06(e) (2012) ....................................... 45
Miller & Kirkpatrick, *Federal Evidence* § 8:71 ........................................ 60
New York Court of Appeals Rule 500.27 .................................................... 50

N.Y. Const. Art. VI § 3(b)(9) ................................................................................ 50

Robert D. Sack, *Sack on Defamation: Libel, Slander,*
*and Related Problems* § 8.2.8 (4th ed. 2012).................................................. 47

Second Circuit Local Rule 27.2(b) ....................................................................... 50

## JURISDICTIONAL STATEMENT

A. Subject matter jurisdiction in the district court for this removed case is based on the existence of a federal question and diversity of citizenship. Defendants-Appellees removed this action from the Supreme Court of the State of New York, County of Nassau pursuant to 28 U.S.C. § 1441, by petition for removal filed September 25, 2007. Subject matter jurisdiction lies pursuant to 28 U.S.C. §§ 1331, 1332(a)(1), 1338(a), (b) and 1367. The federal claim arises under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.* Diversity of citizenship is present in that at the times the action was filed and removed Plaintiff-Appellant was a citizen of Delaware, its member was a citizen of Delaware and the members of its member were citizens of states other than Minnesota, and all defendants-appellees were Minnesota corporations with their principal places of business in Minnesota.

B. Appellate jurisdiction for this appeal is based on 28 U.S.C. § 1291. The appeal is taken from a final judgment of the district court dismissing the action. (SPA-[1]57.)

---

[1] Citations to "SPA-  " are to the Special Appendix in this appeal. Citations to "A-  " are to the publicly filed portions of the Joint Appendix in this appeal. Citations to "CA-  " are to the confidential portions of the Joint Appendix filed under seal.

C.   Judgment dismissing this action was entered on October 2, 2012. (SPA-57.)  Plaintiff-Appellant filed a timely Notice of Appeal on October 29, 2012. (A-1891.)

D.  This appeal is from a final judgment that disposes of all parties' claims.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.   Did the district court err in dismissing this action in its entirety on Defendants'-Appellees' ("Select Comfort") motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 52(c)?

2.   Did the district court fundamentally misperceive Plaintiff-Appellant's ("Sleepy's") case as a garden variety dispute between unhappy competitors, inevitable in retail competition and, consequently, misunderstand or disregard the compelling evidence showing Select Comfort's deceitful scheme to use Sleepy's goodwill, reputation and investment of time, effort and scarce showroom floor space to increase the popularity of Select Comfort's air beds but misappropriate the benefit of Sleepy's efforts through an undisclosed and misrepresented built-in competitive advantage for its own competing retail stores that drove the sales of the Select Comfort beds away from Sleepy's to Select Comfort's own stores?

3.   Did the district court's conduct of the trial, including its numerous, erroneous, inconsistent evidentiary rulings require a new trial?

2

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

Docket No. 12-4437-cv

SLEEPY'S, LLC,

*Plaintiff-Appellant,*

—*against*—

SELECT COMFORT WHOLESALE CORPORATION,
SELECT COMFORT RETAIL CORPORATION and
SELECT COMFORT CORPORATION,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF OF PLAINTIFF-APPELLANT

## STATEMENT OF THE CASE

Plaintiff-Appellant Sleepy's, LLC ("Sleepy's") appeals from the unreported Memorandum & Order (SPA-22 to SPA-56) and Judgment (SPA-57) of the district court (Hon. Thomas C. Platt, J.) dismissing this action on Defendants-Appellees' ("Select Comfort") motion, characterized as a motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 52(c), made during Sleepy's presentation of its case-in-chief at trial. Sleepy's contends, and demonstrates below, that the compelling evidence presented at trial fully supported Sleepy's claims for relief

3

and that the district court wrongly dismissed Sleepy's claims for unfair competition, breach of the implied covenant of good faith and fair dealing and two express contractual provisions, and slander *per se*. Sleepy's further demonstrates that the district court's numerous erroneous and inconsistent rulings at trial and fundamental misunderstanding of the nature of Sleepy's case require that a new trial be granted.

## A. The Nature of the Case

This action arises from a unique "retail partner" relationship between direct competitors, Sleepy's and Select Comfort, from June 17, 2005 until May 2007, and from the terms of a "Dealer Agreement" between the parties that governed the relationship. Sleepy's is a retailer of mattresses and bedding products manufactured by others. Select Comfort is a vertically integrated manufacturer and retailer of adjustable firmness "Sleep Number Beds," which feature an air chamber technology. During the retail partner relationship Sleepy's was selling Select Comfort's bedding products in competition with Select Comfort's own retail stores. As Select Comfort designed the relationship, each party sold a separate line of Sleep Number Beds. To eliminate a real fear of Sleepy's, Select Comfort repeatedly assured Sleepy's that there was no material difference in quality between the lines and that it would not be at a competitive disadvantage with respect to Select Comfort's own stores in selling the separate line.

4

Despite what Select Comfort told Sleepy's, the unknown truth as Sleepy's later discovered was that in fact there was a competitive disadvantage. Select Comfort had sold Sleepy's an inferior product line. Far worse, Select Comfort's sales personnel at its competing retail stores were regularly and systematically disparaging as inferior the line of Sleep Number Beds Sleepy's sold, and Sleepy's itself. Like some unwitting sparring partner who is supposed to lose and make the champion look good, Sleepy's contends that the pattern of disparagement positioned the line Sleepy's was selling as a second quality line and caused Sleepy's to lose sales it would have made if competition with Select Comfort had been on a level playing field as represented.

Sleepy's brought this action to recover its damages. This appeal concerns Sleepy's claims for relief, and the district court's numerous errors which require a new trial:

**Unfair Competition**—Sleepy's contends that Select Comfort's retail partner program was a cleverly disguised scheme to misappropriate Sleepy's reputation, goodwill and investment of time, resources and effort by using Sleepy's to expose the Sleep Number Beds to a wider segment of the public, but drive the sales to its own retail stores;

**Breach of Contract**—Sleepy's contends that Select Comfort breached the Retail Partner Agreement's provisions (a) forbidding the campaign of

disparagement Select Comfort engaged in, and (b) requiring Select Comfort to "[p]rovide first quality merchandise to" Sleepy's;

**Breach of the Implied Covenant of Good Faith and Fair Dealing**—Sleepy's contends that Select Comfort's course of conduct unfairly deprived Sleepy's of the benefits it rightly expected from the Retail Partner Agreement in breach of the implied covenant;

**Slander *Per Se***—Sleepy's asserts a number of claims for slander *per se* arising from defamatory statements by Select Comfort sales personnel

### B. The Proceedings and Disposition Below.

After denial of Select Comfort's summary judgment motion (A-43, Dkt. No. 391), a bench trial commenced on March 21, 2012. Before Sleepy's rested its case-in-chief, Select Comfort sought to move for judgment as a matter of law. The trial was adjourned for briefing of that motion, which Select Comfort characterized both as a motion for judgment as a matter of law and for judgment on partial findings pursuant to Fed. R. Civ. P. 52(c). In a Memorandum & Order dated September 26, 2012, the district court granted the motion in part and denied it in part as a matter of law, and, as to those issues that the court found could not be disposed of as a matter of law, purported to make partial findings in Select Comfort's favor that resulted in dismissal of the complaint. Judgment for Select Comfort was entered on October 2, 2012.

6

## STATEMENT OF FACTS

### The Parties and their Businesses

Sleepy's is a well-known retailer of mattresses and bedding products manufactured by others. (A-300 through A-301 (Tr.346:10-347:4); A-1286 (Tr.2898:1-16); A-1288 (Tr.2906:2-10).) Select Comfort is a vertically-integrated manufacturer and retailer of "Sleep Number Beds" (A-1006 (Tr.2250:18-2251:5); A-1221 (Tr.2780:12-22)), which contain an air chamber that can be adjusted with a pump to vary the firmness of the bed (A-1221 (Tr.2780:25-2782:15).)

### The Retail Partner Relationship

Sleepy's and Select Comfort had a "retail partner" relationship from June 17, 2005 through May 2007 (A-1710; A-278 (Tr.306:6-18); A-1302 (Tr.2961:25-2962:13); A-1219 (Tr.2773:10-2774:2)) that included a Dealer Agreement (the "Retail Partner Agreement" or the "Agreement". (A-1710.) Under that relationship Sleepy's sold a line of Select Comfort beds in its stores in a designated territory. (A-1720; A-1748; A-226 (Tr.181:25-182:14).)

The Retail Partner Agreement provided that it would "expire" on September 30, 2006. (A-1715.) After that date, however, Sleepy's and Select Comfort continued to do business in the same way, including continuing the purchase and sale of Select Comfort beds. (A-276 (Tr.296:20-297:5); Px 171 (documentation of all sales and purchases).) Select Comfort confirmed through its actions and in

7

writing in January 2007 (*see* 20-21, below) that the parties were continuing to operate under the terms of the Retail Partner Agreement. (A-968 (Tr.2178:2-21); A-1072 through A-1073 (Tr.2421:7-2422:11); A-1591.)

Select Comfort knew prior to the beginning of its retail partner relationship with Sleepy's that it had a product with a "gimmicky" image, which needed greater exposure with consumers in more retail stores, where consumers could experience the product first-hand and overcome resistance to the product's image. (CA-287 (Tr.171:3-20); A-1631; A-578 (Tr.1200:16-1202:6; 1202:13-22); A-402 through A-403 (Tr.600:1-601:10).) One reason Select Comfort initiated its Retail Partner Program was to expose the sleep number bed to a greater number of customers. (A-1006 (Tr.2248:9-13); A-1011 (Tr.2268:7-21).) Select Comfort saw the Retail Partner Program as an opportunity to "leverage the Retail Partners' distribution points and reputation in the market." (A-1128 (Tr.2562:20-24); CA-286 through CA-287 (Tr.170:11-171:20).)

What Select Comfort unlawfully concealed from Sleepy's was that it had designed its Retail Partner relationship to give its own stores a built-in competitive advantage that was unknown to Sleepy's. We proved this at trial with an internal Select Comfort document from mid-2004 that revealed that one of its "guiding principles" (CA-54) was that "The Retail Partner program will be defined in a way

8

that: --Provides a competitive advantage to Select Comfort retail stores by giving consumers compelling reasons to visit a SC store." (CA-54.)

Of paramount importance in giving Select Comfort its unlawful competitive advantage, and basic to Select Comfort's design of the Retail Partner relationship, Sleepy's was given a different line of Select Comfort beds from that sold in Select Comfort's own stores. (A-1587.) Sleepy's line was called the Personal Preference line. (A-1222 (Tr.2786:1-9); A-950 (Tr.2109:7-14).) Select Comfort's was called the Core Line. (A-950 (Tr.2109:7-14).) The most important difference for purposes of this case is that Sleepy's line was sold with a wooden foundation, while the Select Comfort stores' line was sold with a plastic polymer foundation. (A-1288 (Tr.2904:18-22); A-951 (Tr.2111:7-11); A-1587; A-1623 through A-1625.)[2]

Select Comfort's Core line Brand Standards Manuals (used to ensure a consistent advertising message (A-1129 through A-1130 (Tr.2567:17-2569:9)) show that Select Comfort considered wood to be inferior to plastic polymer as a material for the foundations beneath its mattresses and intended to communicate

---

[2] Other differences include the availability of an unwired remote control at the Select Comfort stores, which was not made available to Sleepy's, and differences in the ticking and types and thicknesses of foam or padding surrounding the air chamber. (A-1289 (Tr.2909:16-2910:4); A-1012 (Tr.2272:22-2274:1); A-1587; A-1623 through A-1625.)

that to consumers. (CA-224; CA-104.) These manuals consistently proclaimed, "Unlike wood that can shrink, warp and break down, the foundation of the Sleep Number bed is made of strong, high-density polymer that will provide years of support and service." (CA-224; CA-104.[3])

## Select Comfort's Representations to Sleepy's Concerning the Personal Preference Line

Before it entered into the retail partner relationship with Select Comfort, Sleepy's expressed a concern that selling a different line of beds might place it at a competitive disadvantage with the Select Comfort stores if the Personal Preference line were, or were promoted as, of lesser quality. (A-1288 (Tr.2904:6-2907:2); A-184 (Tr.102:12-19); A-1730 through A-1731.) The difference between the plastic and wood foundations was one of Sleepy's primary concerns. (A-1288 (Tr.2906:11-2907:2); A-184 (Tr.102:12-19).) Sleepy's raised its concerns and was assured – specifically and without any equivocations – that there was no material difference in quality between the two lines. Sleepy's was told that it would not be at a competitive disadvantage, and, further that the only reason for the difference

---

[3]  For brevity, only two of the four Core line Brand Standards Manuals in the record are printed in the Joint Appendix. The others contained the same quoted language. (Px 71, p. 36; Px 83, p. 36.) However, the Personal Preference line Brand Standards Manual provided to Sleepy's did not. (A-1539 through A-1584.)

in materials was that the plastic foundation was modular so that it could be shipped in multiple boxes via UPS in accordance with Select Comfort's delivery procedure rather than delivered in one piece by truck as Sleepy's would. (A-184 (Tr.102:12-104:7; Tr.104:8-19); A-186 (Tr.113:3-23); A-187 (Tr.114:2-16); A-188 (Tr.121:24-122:23); A-946 through A-947 (Tr.2093:21-2094:13); A-1013 (Tr.2276:7-18); A-1215 (Tr.2757:19-25); A-1288 through A-1289 (Tr.2907:3-2908:9; Tr.2909:3-2911:3); A-1587; A-1730 through A-1731.)

## Negotiation of the Retail Partner Agreement

In line with its concern about competitive disadvantage, Sleepy's requested and obtained a mutual nondisparagement provision in the Retail Partner Agreement (A-1712, § 4(c)), providing in material part:

> Each party represents that it shall not impair, infringe upon or adversely affect the character, reputation and good will (collectively, the "Brand Image") of the other party.

In addition, Sleepy's specifically discussed with Select Comfort the meaning of § 4(a) of the Agreement obligating Select Comfort to "[p]rovide first quality merchandise to Retail Partner," (A-188 (Tr.121:15-123:22); A-1731) and they agreed that it was intended to mean that Sleepy's would receive merchandise of the same exact quality to that which Select Comfort was selling in its own retail stores. (A-188 (Tr.121:15-123:22); A-1731.)

11

Select Comfort acknowledges that a primary benefit of the Retail Partner Agreement to Sleepy's was the opportunity to realize profits from the sale of Select Comfort beds. (A-2441 (Tr.2441:18-22).)

## Select Comfort's Message to its Own Sales Force Concerning Sleepy's

The Select Comfort beds were introduced in Sleepy's stores in August 2005. (A-214 (Tr.131:20-23).) At the same time, Select Comfort also met with its own regional and store managers to assuage concern about the new competitor (A-816 through A-817 (Tr.1776:24-1778:12); A-819 (Tr.1788:10-12); A-951 (Tr.2112:12-2113:2); A-1121 through A-1122 (Tr.2535:14-2536:4; 2537:15-21) and told them that "Partner stores sell far fewer units than Select Comfort stores" (A-1625), and Select Comfort stores have a number of advantages over retail partners (A-1624; A-1124 (Tr.2547:9-22)), one of which was "polymer foundation vs. wood." (A-1624; A-1124 (Tr.2547:9-12; Tr.2550:16-23.) The meeting was also held to explain, in detail, the differences between the Core and Personal Preference lines so the sales force would be able to address questions from cross-shoppers. (A-805 (Tr.1730:10-15; 1732:11-1733:3); A-1123 (Tr.2542:14-24).) A comparison chart was distributed and used to highlight the differences between the two lines. (A-1586; A-806 (Tr.1735:4-14); A-1123 (Tr.2541:4-22); A-951 (Tr.2110:11-16).)

12

The store managers who attended the meeting were charged with relaying the information they had learned to the sales personnel in their respective stores and training them concerning the differences between the two lines of beds. (A-1122 (Tr.2537:2-5).)

Select Comfort conducted similar meetings with store managers before the Retail Partnership with Sleepy's was expanded to other areas at which a similar written agenda was used. (A-804 (Tr.1726:22-1727:11); A-1122 (Tr.2537:22-2538:12); A-1123 (Tr.2542:7-13).)

## Sleepy's Vigorously Promoted the Select Comfort Beds, but Sales were Consistently Disappointing

Sleepy's expended significant resources promoting and legitimizing the Sleep Number Beds, and in reliance on what it was told by Select Comfort, gave up the opportunity to use its valuable retail floor space, training, and sales force time for other brands. These resources represent a commercial advantage that belongs to Sleepy's. (A-1294 (Tr.2928:2-2930:22).) Based on statements by Select Comfort, which Sleepy's independently determined were reasonable, Sleepy's expected Select Comfort beds to become 10% of its sales. (A-183 (Tr.99:3-101:7); A-1730.) However, despite Sleepy's efforts and commitment of resources, sales of the Sleep Number Beds at Sleepy's were disappointing from the outset and remained so

throughout the relationship. (A-217 (Tr.144:25-145:10); A-1061 (Tr.2374:13-15); A-1294 (Tr.2930:23-2931:3).)

Something was radically wrong and Sleepy's senior management struggled to determine why the Select Comfort product was not succeeding as expected. (A-366 (Tr.542:17-21); A-1295 through A-1296 (Tr.2935:8-2936:7).) The reason did not become apparent to Sleepy's until November of 2006.

**Sleepy's Uncovers the Pattern of Disparagement and Defamation of Sleepy's and the Select Comfort Beds it Sold.**

In late 2006, Sleepy's senior management decided to investigate the hypothesis that sales were disappointing because the Select Comfort sales force was systematically disparaging Sleepy's and the Select Comfort beds it sold. (A-234 (Tr.213:12-214:2); A-1296 (Tr.2936:8-23).) The possibility was considered because, in hindsight, there had been reports of isolated instances of disparagement, one of which Select Comfort acknowledged and apologized for. (A-1296 (Tr.2936:8-23); A-232 (Tr.206:12-22); A-1633.)

To investigate whether disparagement and defamation was systematically occurring, Sleepy's conducted a series of "secret shops"[4] of Select Comfort stores

---

[4]  Contrary to what the district court seems to have thought, there is nothing sinister about the use of secret shops. It is a routine procedure in the retail industry. Stores shop the competition to gain information about what other stores are offering, at what pricing, and what their sales forces are telling consumers. Secret shops are sometimes done by company employees and sometimes by an

in a number of areas. (A-234 (Tr.213:12-214:2); A-1296 (Tr.2937:14-2938:1).)
The secret shops showed a regular pattern of disparagement and defamation by the
Select Comfort sales force of the Select Comfort beds Sleepy's sold and Sleepy's,
itself. The evidence consisted of the testimony of secret shoppers, the shop reports
they prepared that are in evidence, and audio recordings of some of the shops that
are in evidence. The results of the secret shops were telling. Throughout the
territory in which Sleepy's was selling the Select Comfort beds and in adjacent
areas, common themes of disparagement emerged, not always articulated
identically, but nonetheless conveying Select Comfort's unlawful message to
consumers:

- The wood foundation sold at Sleepy's is inferior to the plastic
  foundation sold at the Select Comfort stores (*see, e.g.*, A-1476
  through A-1480; CA-12 through CA-19; CA-23 through CA-31; A-
  1497; A-1502; A-1512; A-398 (Tr.581:19-25); A-423 (Tr.635:6-14);
  A-431.8 (Tr.697:11-13); A-431.9 (Tr.699:11-13); A-431.10
  (Tr.702:13-15); A-431.15 (Tr.724:14-17); A-431.19 (Tr.741:9-13);
  A-431.22 (Tr.750:23-751:16); A-431.24 (Tr.758:17-759:19); A-

---

outside service. Sleepy's used both in this case. (A-179 (Tr.82:10-84:6); A-180
(Tr.87:21-89:18); A-269 (Tr.270:18-271:25).) The secret shoppers take careful
steps to appear to be actual shoppers. (A-179 (Tr.82:23-24); A-610 (Tr.1243:13-
15); A-431.8 (Tr.696:15-17); A-689 (Tr.1466:2-3).)

431.31 (Tr.788:14-16; 789:17-19); A-431.32 (Tr.790:20-791:2); A-436 through A-437 (Tr.820:25-821:22); A-486 (Tr.958:12-959:20); A-556 through A-557 (Tr.1114:10-1115:3; 1116:17-22); A-569 (Tr.1164:2-9); A-574 (Tr.1186:7-9); A-612 (Tr.1249:6-9); A-615 (Tr.1263:8-24); A-645 (Tr.1337:10-12); A-646 (Tr.1344:11-18); A-670 (Tr.1388:3-1389:2); A-675 (Tr.1408:11-15); A-714 (Tr.1510:3-13); A-718 through A-719 (Tr.1526:15-1527:21); A-729 through A-1571 (Tr.1570:25-1571:25); A-736 (Tr.1598:2-10); A-762 (Tr.1634:6-14); A-767 (Tr.1653:1-1654:8); A-871 (Tr.1904:18-23); A-875 (Tr.1915:9-14); A-876 (Tr.1924:18-21));

- Sleepy's Select Comfort beds are stored in a warehouse where they will develop mold, dust mites or allergens, and are not "fresh," whereas the Select Comfort store's beds are made to order and "fresh." (*see, e.g.*, CA-15 through CA-16; CA-30 through CA-31; A-1502; A-1512; A-398 (Tr.581:19-25); A-431.8 (Tr.697:14-16); A-431.20 (Tr.742:10-11); A-431.22 (Tr.751:4-7); A-436 (Tr.819:23-820:17); A-448 (Tr.866:3-9); A-486 (Tr.958:12-960:13); A-569 (Tr.1163:19-1164:1); A-571 (Tr.1172:5-9); A-572 (Tr.1175:22-1176:4); A-615 (Tr.1262:16-24));

16

- Sleepy's offered inferior sales terms and warranty service[5] (*see, e.g.*, A-423 (Tr.635:19-636:2); A-431.9 (Tr.701:10-16); A-431.15 (Tr.724:10-12); A-431.15 through A-431.16 (Tr.725:19-726:2); A-431.24 (Tr.759:23-25); A-448 (Tr.866:24-867:11); A-475 (Tr.915:1-19); A- (Tr. 941:1-5); A-482 (Tr.1112:18-1113:14); A-557 through A-558 (Tr.1118:21-1119:9); A-571 (Tr. 1171:15-18); A-690 (Tr. 1470:16-17));

- It is better to buy at the stores operated by the manufacturer of the beds – the original – than buying "knock-offs" from Sleepy's;[6] (*see, e.g.*, A-431.9 (Tr.698:13-20); A-431.24 (Tr.760:6-15;) A-482 (Tr.941:1-4); A-572 (Tr.1177:9-25); A-610 (Tr.1243:19-1244:4); A-637 (Tr.1307:22-24));

- Sleepy's carries older models of Select Comfort beds that are outdated; Select Comfort stores sell the latest models (*see, e.g.*, A-422

---

[5]  In fact, the warranty service at each store was identical because Select Comfort provides the warranty service for both stores. (A-1712, § 4(c); A-1021 (Tr.2311:20-25); A-1134 (Tr.2585:16-2586:8).)

[6] Sometimes this notion was expressed in metaphors equating buying a Select Comfort bed at Sleepy's with "go[ing] to Home Depot and look[ing] at a John Deere tractor" (A-714 (Tr.1509:8-14)), "like going to a Toyota dealer to get a Mercedez Benz" (A-431.24 (Tr.760:9-10).)

17

(Tr.633:6-18); A-431.31 (Tr.788:22-23); A-909 through A-910 (Tr. 2001:16-2002:17));

- Sleepy's carries only models of Select Comfort beds that have wired remote controls for the air pumps, as opposed to the superior wireless remote controls in models carried by Select Comfort (*see, e.g.*, A-448 (Tr.866:10-14); A-431.22 (Tr.750:23-24); A-431.31 (Tr.788:20-21); A-558 (Tr.1121:18-20); A-736 (Tr.1597:23-1598:1); A-767 (Tr.1653:1-3));

- Sleepy's carries models of Select Comfort that have inferior foam, padding, ticking, or fabric.[7] (*see, e.g.*, A-431.15 (Tr.724:18-725:2); A-431.9 through A.431.10 (Tr.701:22-702:7); A-474 (Tr.911:20-23).)

**Select Comfort's Advertising and Promotional Materials Disseminated the Brand Standards Manuals' Message that Wood was Inferior to Plastic as a Foundation Material.**

In addition to the unlawful sales pitch of its sales personnel, Select Comfort repeated its disparagement of the product sold in the Sleepy's stores in its advertising and promotional materials which repeat the advertising message of the

---

[7] Other lines of disparagement included: "the product sold by Select Comfort was vastly superior . . . [Sleepy's] were starter products" (A-572 (Tr.1177:20-24)); "Sleepy's has a lot of people asking for their money back . . . they walk out of Sleepy's and come to Select Comfort" (A-615 (Tr.1264:20-25)); Sleepy's sells inferior pumps and may be selling you a refurbished bed but not telling you (CA-

Brand Standards Manuals – that wood is an inferior material for the Select Comfort foundation (*see* 9-10, above) – and communicated that message to consumers.     (A-1707,  A-829  (Tr.1828:12-1829:25);  A-1129  (Tr.2565:19-2566:14); A-1664; A-830 (Tr.1830:7-1832:17); A-1129 (Tr.2566:15-2567:10); A-1645; A-830 through A-831 (Tr.1832:23-1836:1); A-1702; A-957 through A-958 (Tr.2135:19-2141:7); A-822 through A-823 (Tr.1798:11-1803:21).)  For example, a Select Comfort promotional brochure (A-1707) states:

> **Great sleep starts with a**
> **Sleep Number® Foundation**
>
> Precision engineered and constructed of high-density polymer, our foundations provide solid and uniform support for your mattress and won't warp, twist or break down like old fashioned wood box springs.  They're simple to assemble and move, fit with standard bed furniture and frames, and are covered in a matching coverlet.

The evidence showed that consumers (A-403 (Tr.602:12-14; 602:23-603:8; 603:25-604:6;  604:17-20); A-428 (Tr.656:7-11; 657:5-12); A-478 (Tr.927:4-7; 927:10-25; 928:16-20); A-491 (Tr.980:12-21); A-492 (Tr.981:7-12; 981:20-23); A-440 (Tr.833:17-834:9); A-451 through A-452 (Tr.880:20-881:5; 881:14-20); A-(Tr.1266:23-1267:18;    1267:21-1268:4);    A-579    (Tr.1203:3-25);    A-648 (Tr.1350:24-1351:9)),  as  well  as  Select  Comfort  sales  personnel  (A-736

---

28 through CA-31; A-431.19 through A-431.20 (Tr.740:5-7; 742:13)); Select Comfort was just using Sleepy's to gain exposure. (A-637 (Tr.1307:10-13).)

(Tr.1598:2-6); A-431.15 (Tr.724:14-17); CA-28 through CA-29), and senior executives regularly refer to the structure beneath the mattress as a "box spring" whether or not it has springs. (A-1158 (Tr.2609:12-2611:20); CA-264 (Tr.62:9-20).) Accordingly, consumers would understand the negative reference to "wood box springs" to apply to the wood foundations at Sleepy's. Other Select Comfort advertising materials conveyed a similar message. (A-1645; A-1664; A-1702; A-1707.)

## Sleepy's Presents the Shop Report Evidence to Select Comfort.

Sleepy's confronted Select Comfort with its shop reports at a meeting on January 3, 2007 (A-242 through A-243 (Tr.246:23-247:11); A-1300 (Tr.2954:10-20); A-1301 (Tr.2958:20-2959:4); A-1073 (Tr.2422:25-2423:9); A-1218 (Tr.2770:13-22)), expecting that seeing the actual reports would convince Select Comfort that it should address and fix the problem. (A-235 (Tr.215:3-7); A-241 (Tr.240:4-13); A-1298 (Tr.2944:17-2945:3); A-1299 through A-1300 (Tr.2951:22-2952:2).) Sleepy's requested a letter from Select Comfort's CEO giving assurance that the disparagement would stop. (A-242 (Tr.244:21-245:10); A-1300 through A-1301 (Tr.2955:14-2956:13); A-967 (Tr.2175:22-2176:1); A-1219 through A-1220 (Tr.2774:12-2775:11).) Select Comfort responded that such a letter was not necessary because the Retail Partner Agreement already forbad the disparagement in issue. (A-1301 (Tr.2957:16-2958:4); A-1072 (Tr.2421:7-22); A-

20

1073 (Tr.2423:10-13); A-1591 through A-1592; CA-256).) That position was later reiterated in writing.[8] (A-1591.)

Instead, on January 11, 2007, Select Comfort notified Sleepy's by letter that it wanted to end and wind up the Retail Partner relationship. (A-276 (Tr.296:9-19); A-1219 (Tr.2771:19-2771:24); A-1590).) Nevertheless, the relationship continued for several more months, (A-278 (Tr.305:9-306:1); A-1675; Px 171.49)), and, in a January 23, 2007 letter (A-1722), Select Comfort's CEO told Sleepy's:

> All of us at Select Comfort were disappointed by what we read in the shopping reports that you provided to us. We took immediate action to address the reported behavior . . . .

Sleepy's tested Select Comfort's word and performed additional secret shops that revealed that Select Comfort's word was worthless: the disparagement continued unabated. (A-278 (Tr.304:4-18); CA-370 through CA-371; A-423 (Tr.635:6-11); A-436 through A-437 (Tr.820:25-821:22); A-474 (Tr.911:16-912:9); A-486 (Tr.958:12-16); A-569 (Tr.1163:24-1164:9); A-610 (Tr.1243:18-21); A-874 (Tr.1915:8-17); A-278 (Tr.304:19-305:2).) Put another way, Select Comfort's

---

[8]   This exchange makes clear that Select Comfort considered the terms of the Retail Partner Agreement to be in effect and to govern the parties' relationship at that time, which was after the nominal expiration date in the Agreement.

claim that it would take "immediate action to address" its behavior was not only inadequate, it never happened.[9]

The result was the end of the parties' retail partnership on April 18, 2007, when they entered into a Wind-Up agreement providing for the orderly wind up of the Retail Partner relationship. (A-278 (Tr.306:2-18); A-1302 (Tr.2961:11-2962:7); A-1675 through A-1677).) The relationship continued until early May 2007 when the last Select Comfort beds and materials were removed from Sleepy's stores. (A-276 (Tr.305:9-306:1); A-1675 through A-1677.)

## SUMMARY OF THE ARGUMENT

The dismissal of Sleepy's complaint during its case-in-chief was, we submit, erroneously based on the district court's fundamental misperception that this case was nothing more than the "sour grapes" of an unhappy business relationship. The result was that the district court gave Select Comfort a free pass on the unlawful disparagement by Select Comfort's sales force and either misunderstood or overlooked the evidence that proved Sleepy's was the victim of a clever scheme

---

[9] None of Select Comfort's witnesses could remember what was done, who was contacted, or whether anything was issued in writing. Nor did they know whether any Select Comfort sales personnel were fired or disciplined in any way, or whether any of the sales personnel identified in shop reports they reviewed were even contacted. (A-969 (Tr.2184:1-2185:18); A-1220 (Tr.2776:8-2778:2).)

22

orchestrated by Select Comfort's senior management to deprive Sleepy's of the bargained for benefits of the retail partner relationship and enhance sales made in the Select Comfort stores at the expense of Sleepy's.

**A.** The district court erroneously dismissed Sleepy's claim for unfair competition based on a misunderstanding of the wrongs suffered by Sleepy's. The claim arises under the misappropriation branch of unfair competition. The competitive advantage misappropriated was Sleepy's reputation, goodwill, and expenditure of skill, resources and scarce floor space made in the belief that the parties were competing on a level playing field. The district court appears to have believed that the claim somehow involved misappropriation of the pattern of disparagement. Consequently, the district court completely overlooked the evidence showing that Select Comfort had structured its retail partner program, and behaved, in a way that enabled it to misappropriate Sleepy's commercial advantage.

Contrary to the decision below, the unfair competition claim does not depend on whether the Retail Partner Agreement was in effect at the time the denigration occurred. Unfair competition does not require a contractual or other relationship and the parties were always competitors.

**B.** The district court erroneously determined that the nominal expiration of the Retail Partner Agreement before the pattern of disparagement came to light

required dismissal as a matter of law of Sleepy's claim for breach of the implied covenant of good faith and fair dealing, and claims for breach of §§ 4(a) and 4(c) of the Agreement. Where, as here, the parties continued to deal after expiration, the terms are either extended by conduct or a new agreement on the same terms arises by conduct.

The district court's construction of § 9(e) of the Agreement to bar application of the above principles was erroneous. As explained below (at 33-40) 9(e) applies to "termination," not "expiration" of the Agreement (as those terms are used in the Agreement) and the Agreement was never "terminated."

Further, the district court erroneously construed § 4(a) by overlooking the unrefuted evidence that the parties understood that "first quality" meant equivalent to the line Select Comfort's stores sold. (*See* 42-46, above.) Properly construed, the evidence showed that Select Comfort breached that provision as well.

**C.** The district court erroneously held that all but one of Sleepy's slander *per se* claims was consented to, and therefore not actionable, solely because the secret shopper mentioned Sleepy's before the Select Comfort salesperson made the defamatory statement. That is not New York law. An honest inquiry or investigation concerning possible defamation, such as occurred here, is not the equivalent of consent.

Further, the district court's finding that the slanderous statement "Sleepy's will not honor" the warranty was non-actionable as "loose" and "hyperbolic," or ambiguous, words, was clearly erroneous and reveals the district court's failure to perceive that there is a basic difference between lawful sales talk and actionable wrongdoing.

**D.** Finally, the district court's inconsistent and erroneous evidentiary rulings concerning (1) customer state of mind evidence showing that, contrary to the district court's personal view not based on the record, the pattern of disparagement involved in this case affects consumer purchasing decisions, and (2) admissibility of audio recordings of secret shops, coupled with the errors described above require a new trial to afford Sleepy's a fair opportunity to present its case.

## ARGUMENT

### I.

### THE DISTRICT COURT ERRED IN DISMISSING SLEEPY'S UNFAIR COMPETITION CLAIM.

The district court dismissed Sleepy's unfair competition claim as a matter of law, stating that Sleepy's "failed, simply, to provide any evidence that Defendants misappropriated a commercial advantage that belonged to Plaintiff." (SPA-38.) This Court reviews a district court's ruling dismissing a claim as a matter of law

*de novo. Millea v. Metro N. R.R. Co.,* 658 F.3d 154, 161 (2d Cir. 2011).
Judgment as a matter of law is available only if there is no legally sufficient
evidentiary basis for a reasonable fact finder to find for the plaintiff. *See id.*

The evidence presented at trial amply supported Sleepy's claim under the
misappropriation branch of the tort of unfair competition. However, the district
court failed to understand the claim or appreciate the significance of the evidence.
"[U]nfair competition involving misappropriation usually concerns the taking and
use of the plaintiff's property to compete against the plaintiff's own use of the
same property. The term 'commercial advantage' has been used interchangeably
with 'property' within the meaning of the misappropriation theory." *ITC Ltd. v.
Punchgini, Inc.,* 9 N.Y.3d 467, 478, 850 N.Y.S.2d 366, 373 (2007) (internal
citations omitted). Unfair competition is "a broad and flexible doctrine that
depends more upon the facts set forth than most causes of action," encompassing
any form of commercial immorality, or simply endeavoring to reap where one has
not sown involving the taking of the skill, expenditures and labor of a competitor.
Unfair competition is "adaptable and capacious." *Barclays Capital Inc. v.
Theflyonthewall.com, Inc.,* 650 F.3d 876, 895 (2d Cir. 2011), quoting *Roy Exp. Co.
Establishment v. Columbia Broad. Sys., Inc.,* 672 F.2d 1095, 1105 (2d Cir. 1982);
*see also Standard & Poor's Corp. v. Commodity Exch., Inc.,* 683 F.2d 704, 710
(2d Cir. 1982).

In this case, the evidence showed that the parties competed in the sale of Select Comfort air beds and that Select Comfort stacked the deck against Sleepy's by engaging in a course of conduct designed to misappropriate Sleepy's skill, expenditures and labor in connection with those beds. Select Comfort (a) devised a retail partner program with built in, but undisclosed, advantages for Select Comfort, designed to expose the air bed to consumers more widely to dispel its "gimmicky" image but make most of the sales in the Select Comfort stores, (b) induced Sleepy's to use its goodwill, reputation, time, effort and valuable floor space to popularize the air beds by misrepresenting the existence of the built-in competitive advantage and leading Sleepy's to believe it was competing on a level playing field, and (c) drive sales from Sleepy's to its own stores by disparaging the line at Sleepy's and Sleepy's, itself, to the purchasing public.

The district court entirely overlooked the key evidence, including (a) the internal document stating that giving its own stores a competitive advantage was a "guiding principle" of the retail partner program (CA-54), (b) the Brand Standards Manuals showing that Select Comfort considered wood to be an inferior foundation material and intended that to be part of its brand message for the Core line (CA-104, CA-224), (c) the misrepresentations to Sleepy's that the competitive playing field was level (*see* 10-11, above), and (d) the role played by the pattern of disparagement in redirecting the sales. (*See* 14-18, above.) Although the

27

district court adverted to the testimony acknowledging that the retail partner program was created to expose the Select Comfort beds to a greater number of customers, and represented an opportunity to "leverage" Sleepy's "reputation in the market" (SPA-37), he failed to note how that testimony fit into the mosaic of the claim. The district court did not discern that this case involved anything more than a complaint about Select Comfort's pattern of disparagement. Indeed, on the last day of trial the district court stated his understanding that, "[t]his case is built upon the defamation if you will of a product." (A-1459 (Tr.3301:20-21).) He had previously made abundantly clear that he considered the pattern of disparagement to be a trivial matter.[10]

Further, the district court's decision indicates that he did not understand that the misappropriated commercial advantage was Sleepy's name, reputation, skill, expenditures and labor in using its scarce floor space and sales resources to promote the Select Comfort beds, believing that it was engaged in fair competition

---

[10]  During the trial, the district court told the parties at sidebar, "The whole basis for this case is a big issue in and of itself. And inasmuch as the -- if you have done any shopping, or done any -- or you have ever been involved in discussions with people in general commerce -- I haven't had much. Talk between people who are working the process becomes not very important. And to make an issue out of every slight -- showing it to you and you talk to somebody else is not an uncommon sequence of events in commercial enterprise.... [H]ow much value you can give to comments in the workplace. It's troublesome to begin with." (A-710 (Tr.1492:1-9, 1493:1-3).)

28

with Select Comfort's stores. In unfair competition claims "New York courts have found that persons have a protectable property interest in their 'labor, skill, expenditure, name and reputation.'" *Hall v. Bed Bath & Beyond, Inc.,* No. 2011-1165, 2011-1235, 2013 US App. LEXIS 1995, at *27-28 (Fed. Cir. Jan. 25, 2013), quoting *LinkCo, Inc. v. Fujitsu Ltd.,* 230 F. Supp. 2d 492, 502 (S.D.N.Y. 2002) (citations omitted) quoting, in turn, *Metropolitan Opera Ass'n. v. Wagner-Nichols Recorder Corp.,* 199 Misc. 786, 101 N.Y.S.2d 483, 492 ( Sup. Ct. N.Y. County 1950). The decision below vaguely suggests that the "commercial advantage" in issue was "Defendants' representations to customers." (SPA-37.) This demonstrates the lower court's fundamental misunderstanding of the unfair competition claim.

Further, the district court wrongly believed that the unfair competition claim depended on the continued existence of the Retail Partner Agreement for its viability. (SPA-36 through SPA-37) In fact, the unfair competition theory does not depend on the Agreement. Nor does the tort of unfair competition depend on a contractual relationship between the parties. *Hall,* 2013 U.S. App. LEXIS 1995, at *27-28 (district court erred in holding that a contractual relationship is required to support a claim under misappropriation branch of unfair competition.) The commercial advantage misappropriated here does not stem from the Agreement, rather from Sleepy's skill, expenditures and labor. Nor does Sleepy's

understanding that the competitive playing field was level depend on the Agreement. It arises from Select Comfort's pre-agreement representations. The parties were competitors throughout the relationship whether or not the Agreement was in effect after September 30, 2006. In any event, even if continued existence of the Agreement were somehow necessary, as we demonstrate below (at 33-40) the Agreement, or the terms of the Agreement did continue in effect and the district court's determination to the contrary was erroneous.

Finally, far from what the district court wrote in the decision, Sleepy's reliance on *Electrolux Corp. v. Val-Worth, Inc.,* 6 N.Y.2d 556, 190 N.Y.S.2d 977 (1959), below and in this Court, is entirely apposite, not, to use the district court's word, "bizarre." (SPA-37) *Electrolux* stands for "[t]he principle that one may not misappropriate the results of the skill, expenditures and labors of a competitor . . . ." 6 N.Y.2d at 567. The unfair competition schemes there, and here, are quite similar.

In *Electrolux,* the defendant's scheme misappropriated Electrolux's commercial advantage, including the credibility of its well-known name, by advertising rebuilt Electrolux vacuum cleaners at attractive prices to attract consumers, but driving sales to other more expensive brands by then disparaging the rebuilt Electrolux machines as "just a lot of junk" and introducing the new brand. 6 N.Y.2d at 561, 566-67. It was a 3-part scheme comprised of (a)

30

advertising a rebuilt Electrolux vacuum at an attractive price, (b) getting the customer's attention with the Electrolux while intending to sell a competitive product at a greater price, and (c) switching the transaction by "knocking" or disparaging the rebuilt Electrolux.

The evidence presented at the trial established that Select Comfort had devised a 3-part scheme comprised of (a) the creation of a retail partner program with built in (and undisclosed) advantages that allowed Select Comfort to popularize its "gimmicky" air beds, but limit the competitor's sales, (b) inducing Sleepy's to use its goodwill, reputation with consumers, time, effort and floor space by representing that Sleepy's would be competing on a level playing field, and (c) switching sales from Sleepy's to Select Comfort stores by "knocking" or disparaging the Select Comfort product sold at Sleepy's. Although the schemes may not be identical, *Electrolux*'s precedential effect in this case cannot be ignored. Indeed, the court in *Electrolux* noted the breadth of unfair competition, stating "[t]he incalculable variety of illegal commercial practices denominated as unfair competition is proportionate to the unlimited ingenuity that overreaching entrepreneurs and trade pirates put to use." 6 N.Y.2d at 568 (citation omitted).

The district court's observation that "[i]n the present case, the parties were luring customers into [Sleepy's] showrooms, not [Select Comfort's] showrooms" (as in *Electrolux*) (SPA-37) is flatly wrong and, again, shows the district court's

31

fundamental misunderstanding of the case. In fact, Select Comfort was using its scheme to "lure" customers *from* Sleepy's showrooms *into* its own showrooms to make the sales.

Accordingly, the district court's decision should be reversed insofar as it dismissed Sleepy's unfair competition claim.

## II.

### THE DISTRICT COURT ERRED IN DISMISSING SLEEPY'S CONTRACT CLAIMS.

Sleepy's asserted three contract claims under the Retail Partner Agreement (A)—(i) breach of the implied covenant of good faith and fair dealing, (ii) breach of the non-disparagement provision in § 4(c) (A-1712), and (iii) breach of § 4(a)'s requirement that Select Comfort "[p]rovide first quality merchandise to" Sleepy's (A-1712). The district court dismissed the implied covenant and § 4(c) claims as a matter of law based on a determination that the terms of the Retail Partner Agreement did not apply to the parties' business relationship after its September 30, 2006 nominal expiration date. The district court construed the contract to foreclose the application of the normal rules of Minnesota law (which governs the Retail Partner Agreement) that where the parties continue to deal after the expiration date of a contract the contract's terms continue to apply, by virtue of either an extension of the contract based on conduct or a new contract on the same

32

terms based on conduct. (SPA-26; SPA-33) This Court reviews the district court's contract interpretation *de novo.* *Global Seafood Inc. v. Bantry Bay Mussels Ltd.,* 659 F.3d 221, 224 (2d Cir. 2011).

We demonstrate below that the district court's contract construction was erroneous, that the normal rules apply so that the Agreement's terms were applicable throughout the relationship, and that the evidence supported Sleepy's claims for breach of the implied covenant and breach of the non-disparagement provision.

As to § 4(a), the "first quality" provision, the district court determined as a matter of law that its meaning was ambiguous, adopted the meaning Select Comfort urged and dismissed the claim as a matter of law based on a determination that there was no evidence of breach. (SPA-31; SPA-32) We demonstrate below that the district's court's construction of § 4(a) was erroneous, that the district court overlooked or ignored undisputed evidence showing that the parties intended the meaning Sleepy's urged, and that the evidence supported Sleepy's claim for breach under the proper construction.

### A. The Terms of the Retail Partner Agreement Applied Throughout the Parties' Business Relationship.

Under Minnesota law, which governs the Retail Partner Agreement (A-1717), "[w]hen a contract governs the duties of the parties for a specified term and

it has expired, the parties may thereafter enter into a new contract by conduct . . . or otherwise." *Dynamic Air, Inc. v. Reichhold, Inc.*, No. 05-CV-0955 (PJS/PLE), 2007 U.S. Dist. LEXIS 57651, at *21-22, 24 (D. Minn. Aug. 7, 2007) (where contract expired, court found parties entered new contract based on their conduct, on same terms as old contract, where there was no evidence of intent to change terms) (quoting *Bolander v. Bolander*, 703 N.W.2d 529, 542 (Minn. Ct. App. 2005)). Alternatively, the parties' conduct may be deemed to extend the terms of an expired contract. *Id.,* at *21-24; *Cherne Contracting Corp. v. Marathon Petroleum Co.*, 578 F.3d 735 (8th Cir. 2009); *Fischer v. Pinske*, 309 Minn. 202, 204-06, 243 N.W.2d 733, 735 (1976).

In this case, the nominal September 30, 2006 expiration date of the Retail Partner Agreement passed and the parties continued to conduct their business relationship, including the continued purchase and sale of beds between the parties. (*See* 22, above.) Further, in January 2007, Select Comfort took the position that the terms of the Retail Partner Agreement remained in effect. (*See* 20-21, above) However, the district court construed a provision of the Agreement, § 9(e), to override the general rule and prevent any extension or readoption of the terms by conduct. (SPA-33.)

In reaching that construction, the district court relied on a decision, *Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.,* 408 F.3d 460, 467 (8th Cir.

34

2005), that expressly applies New York, not Minnesota, law and a quoted excerpt of § 9(e) of the Retail Partner Agreement, concerning "waiver of termination" that omitted key language by ellipsis, and also ignored the distinction the agreement makes between "termination" and "expiration." (SPA-33 through SPA-35.) These errors led to an erroneous construction in which "termination" and "expiration" were treated as synonymous. If anything, the Agreement "expired" on September 30, 2006 (but the terms continued to apply under Minnesota law). There was never a "termination" as that term is used in the Agreement and so the "waiver of termination" clause of § 9(e) has no application to this case.

The provisions of § 9 of the Agreement, considered as a whole, make clear that the parties intended "termination" to be a separate concept or event from "expire" or "expiration" They were not used as synonyms. Sections 9(a)—9(d) provide:

> (a) **Initial Term.** Subject to earlier *termination* in accordance with any provisions of this Agreement, the term of this Agreement shall commence as of the Effective Date and will *expire* September 30, 2006 (the "Initial Term")

> (b) **Renewal Periods.** At least sixty (60) days prior to the *expiration* of the Initial Term, Select Comfort will, at its sole discretion, provide retail Partner our proposed Retail Partner Agreement.

(c) **Termination for Cause.** Upon a material breach of this Agreement that has not been cured to the reasonable satisfaction of the non-breaching party within ten (10) days after notice of such breach, this Agreement may be *terminated* by the non-breaching party effective immediately upon written notice of *termination* or effective upon such later date as may be specified in the notice of *termination* from the non-breaching party.

(d) **Termination upon Certain Events.** In the event that [specified events occur] this Agreement may be *terminated* by the other party effective immediately upon written notice of *termination* or effective upon such later date as may be specified in the notice of *termination* from the *terminating* party.

(A-1715) (Emphasis supplied.)

Section 9(e) then provides as follows (with language omitted by ellipsis in the district court's quotation of the provision (at SPA-33) indicated by brackets):

(e) **Waiver of Termination.** The conduct by either of the parties after *termination* of this Agreement, including without limitation any sale of any of the Products, will not be construed as a waiver of *termination* [of this Agreement] or as an extension or continuation of the term of this Agreement [beyond the period specified in the notice of *termination*]; any such *termination* of this Agreement may only be waived by an express written waiver of *termination* signed by the *terminating* party.

(Emphasis supplied.) The parties thus used "termination" to refer to an affirmative act, to be accompanied by a Notice of Termination, that would end the Agreement prior to the end of its Term. In contrast, they used "expire" or "expiration" to refer to the passive ending of the Agreement upon completion of its term. If the parties

36

had intended "termination" and "expiration" to mean the same thing, they would have used the same word. The use of different words indicates that the parties intended that they have distinct meanings. *Eveleth Taconite Co. v. Minn. Power & Light Co.*, 301 Minn. 20, 27-28, 221 N.W.2d 157, 161-62 (1974) (considering the contract as a whole, and finding that the contract's use of two separate phrases, "term" and "terms or conditions" in different contexts, "gives further evidence that the parties intended those words to have different meaning."). Construing different words to have the same meaning does violence to the principle of contract construction that all words in the contract be given some meaning and effect. *Id.*

Other courts considering similar issues have recognized the distinction between "termination" and "expiration." *E.g., Upper Midwest Sales Co. v. Ecolab, Inc.*, 577 N.W.2d 236, 243 (Minn. Ct. App. 1998) (Minnesota statute referring to "termination" of a contract inapplicable where contract expired by its own terms); *Huizenga v. Am. Int'l Auto. Dealers Ass'n.,* No. 1:05cv264(JCC), 2005 U.S. Dist. LEXIS 30972, at *11 (E.D. Va. Nov. 22, 2005) (allowing agreement to expire distinguishable from termination); *Lewis v. Rahman*, 147 F. Supp. 2d 225, 236 (S.D.N.Y. 2001) ("since the contract uses 'expiration' when referring to the lapse of time of the exclusive negotiating period, and 'terminate' when referring to CKP's rights to affirmatively end the agreement under paragraphs 16 and 18, it is clear that

37

'termination' in the right of first refusal provision refers only to CKP's exercise of its rights to affirmatively end the agreement."); *In re Morgan*, 181 B.R. 579, 583-84 (Bankr. N.D.Ala. 1994) (expire and terminate not synonymous. To "expire" means "to come to an end," while "terminate" means "to bring to an end"); *Hawes Office Sys., Inc. v. Wang Laboratories, Inc.*, 524 F. Supp. 610, 614 (E.D.N.Y. 1981) (where contract distinguished expiration for non-renewal from termination for non-performance, use of "terminate" in the addendum to the contract held only to refer to the latter).

Moreover, in reaching his construction of § 9(e), the district court disregarded language omitted from his quotation that makes it even more obvious that the provision has no application to what occurred in this case. The district court quoted the provision as stating that conduct of the parties will not be construed "as an extension or continuation of the term of this Agreement . . ." The provision actually says that conduct will not be construed "as an extension or continuation of the term of this Agreement *beyond the period specified in the notice of termination*." (A-1715) (Emphasis added). The omitted language is material and reveals the true meaning of § 9(e). It indicates that for § 9(e) to apply at all, a notice of termination *must* have been issued to limit extension or continuation of the term.

38

"Termination," as used in the Retail Partner Agreement, did not occur on September 30, 2006 or ever.  There was no premature end to the Agreement and there was no notice of termination given, as specified in the Agreement.  Accordingly, the "waiver of termination" provision has no application to this case and the district court's construction of it to bar application of the ordinary rules concerning continued business relations between the parties was error.

In addition to a correct reading of the language of the Agreement, the parties' actions, in particular Select Comfort's actions, after September 30, 2006 show both that the parties considered the terms of the Agreement to continue in effect and that the parties did not consider a "termination" to have ever taken place.  First, at the January 3, 2007 meeting Select Comfort took the position, with which Sleepy's agreed, that the letter from its CEO affirming non-disparagement going forward was not necessary because the Agreement already forbad it.  (*See* 20-21, above.)  Second, in April 2007 the parties entered into a separate Wind Up Agreement (A-1675 through A-1677) concerning the wind up of the relationship, rather than invoke the provisions of § 9(f) of the Agreement concerning "Effect of Termination," which specifies how the relationship is to be wound up "[u]pon termination of this Agreement."  Had there been a "termination" no separate Wind Up Agreement would have been necessary.  In construing a contract, the parties' actions showing their understanding of its meaning are a strong indication of the

39

meaning and must be given weight. *Sec. Mut. Cas. Co. v. Luthi*, 303 Minn. 161, 167, 226 N.W.2d 878, 883 (1974) ("[T]he unequivocal understanding of the parties as shown by their conduct [is] persuasive evidence of a term's meaning, [as long as] the conduct [is] of such a nature as to permit but one conclusion. Moreover, to imply meaning from conduct, the acting party must have placed some significance on his conduct in relation to the contract term.").

Accordingly, the district court's dismissal of Sleepy's contract claims because the Retail Partner Agreement's terms were, as a matter of law, supposedly not in effect after September 30, 2006 was error.

### B. The Evidence Supported Sleepy's Claim for Breach of the Covenant of Good Faith and Fair Dealing.

It is undisputed, and the district court noted, that under Minnesota law every contract includes an implied covenant of good faith and fair dealing. (SPA-26.) The implied covenant prohibits conduct that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract. *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011); *accord Kivel v. WealthSpring Mortgage Corp.*, 398 F. Supp. 2d 1049, 1058 (D. Minn. 2005) (covenant violated "where a party evades the spirit of the bargain") (citation and internal quotation omitted).

Select Comfort admits in this case that a primary benefit to Sleepy's of the parties' relationship was Sleepy's opportunity to generate profits from the sale of Select Comfort beds in Sleepy's stores. (A-1077 (Tr.2441:18-22).) Apart from any violation of the express provision of the Retail Partner Agreement, the overwhelming evidence showed that Select Comfort's unlawful actions prevented Sleepy's from receiving the fruits of the contract, *i.e.,* the profits it expected to receive from sales of the Select Comfort beds. Select Comfort induced Sleepy's to become its Retail Partner to compete with its own stores on what it represented was a level playing field. Instead, it tilted the playing field toward its own stores by building an undisclosed competitive advantage into the program and exploiting that advantage through the disparagement campaign, which led consumers to view the Select Comfort beds at Sleepy's as a second-class line. This drove sales and customers from Sleepy's to Select Comfort. The evidence supports the conclusion that Select Comfort's actions deprived Sleepy's of the fruits of the contract and evaded the spirit of the bargain. It should not be permitted to escape its obligations with impunity, yet that is precisely what the district court sanctioned.

## C. The Evidence Supported Sleepy's Claim for Breach of the Non-Disparagement Provision of the Agreement.

The district court dismissed Sleepy's claim for breach of § 4(c) of the Agreement as a matter of law based on his view that the Agreement was not in

41

force after September 30, 2006 and that no evidence of disparagement before that date was presented. (SPA-35.) Quite to the contrary, we demonstrated at the trial and in this appeal that the Agreement's terms did in fact remain in force after September 30, 2006. The record contains ample evidence of disparagement in breach of § 4(c) after that date — the testimony of the secret shoppers, their shop reports to the extent they were admitted in evidence, and their recordings of the secret shops to the extent they were admitted in evidence. (*See* 15-18, above.) We submit that this evidence, in addition to showing breaches after that date, justifies an inference that the same pervasive pattern of conduct was occurring before it. In any event, the evidence is more than sufficient to show breaches of § 4(c) and the dismissal of the claim for its breach as a matter of law was erroneous.

### D. The District Court's Construction of the "First Quality" Provision of the Agreement was Erroneous.

Section 4(a) of the Retail Partner Agreement obligated Select Comfort to "[p]rovide first quality merchandise to" Sleepy's. Sleepy's claims that Select Comfort breached that provision by delivering to Sleepy's a line of beds — the Personal Preference line — that it intentionally positioned in the marketplace and portrayed to consumers through the campaign of disparagement and advertising as inferior to the Core line sold in its stores. This made it second quality, even if objectively it was unflawed and performed to the same standards as the Core line.

42

The parties disputed the meaning of "first quality." Sleepy's urged that the parties had expressly discussed the meaning and, in line with its concerns about being at a competitive disadvantage from selling a second quality line, acknowledged that it meant merchandise that was as good as that sold in the Select Comfort stores. (*See* 11, above.) Select Comfort urged that first quality simply meant new, unflawed products.

The district court held, as a matter of law, that from the four corners of the Agreement alone, the meaning of "first quality" was ambiguous. He then purported to find as a fact that Select Comfort's proposed construction was correct. He dismissed the claim for breach of § 4(a) based on that construction and the lack of evidence that the Personal Preference line was objectively flawed or objectively performed to lower standards than the Core line, which, of course, was never Sleepy's claim.

We submit that the district court's construction of "first quality" was clearly erroneous. This court reviews the determination of ambiguity *de novo, Lee v. BSB Greenwich Mortgage Limited Partnership,* 267 F.3d 172, 178 (2d Cir. 2001), and the district court's findings as to the meaning of ambiguous provisions for clear error, *Manning v. New York Univ.,* 299 F.3d 156, 162 (2d Cir. 2002). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a

43

mistake has been committed." *Otal Invs. Ltd. v. M/V Clary*, 673 F.3d 108, 113 (2d Cir. 2012) (citations and internal quotations omitted).

The district court's finding that the parties intended "first quality" to mean new, unflawed products was clearly erroneous for two reasons. First, it completely ignores the unrebutted evidence in the record of the parties' intent when they used the words "first quality" in the Agreement. Before the Agreement was signed, the parties expressly discussed the meaning of "first quality" and confirmed that it meant exactly what Sleepy's says. Michael Bookbinder, Sleepy's former Vice President of Sales and Marketing, who participated in the negotiation of the Retail Partner Agreement, testified that he discussed what first quality meant in § 4(a) with the Select Comfort representatives, and that those discussions "centered around whether . . . the products that we as the retail partner would carry the same quality as the products sold in the Select Comfort retail stores. . . . [W]e just want to be able to say unquestionably and tell our sales force that Select Comfort says it right in their contract, the dealer agreement, that the product we're carrying is first quality merchandise and that it is not inferior in any way to what is being sold in the Select Comfort Stores." (A-189 (Tr.122:3-16.) Mr. Bookbinder further testified that in the context of talking about § 4(a) Select Comfort told him that the products Sleepy's would sell "are top quality, first quality, not substandard, and that we, Sleepy's, and our sales people would not be at a

44

competitive disadvantage. It is the same quality, just different features and benefits." (A-188 through 189 (Tr.121:24-123:22).)

Timothy Werner, who participated in the drafting of the Retail Partner Agreement for Select Comfort, candidly agreed with Mr. Bookbinder when he testified at the trial. Mr. Werner confirmed in his testimony that it was his understanding that § 4(a) "obligated Select Comfort to deliver products to Sleepy's of the same high quality as those that were sold in Select Comfort stores." (A-1158 (Tr.2609:4-8; 2609:11)

Against this specific evidence that the parties discussed the meaning of § 4(a) and were in agreement on it, the district court chose to adopt a purported ordinary, generally accepted meaning of the term from citations provided by Select Comfort to cases involving other agreements in other contexts. When construing an ambiguous term, parol evidence of the parties' actual discussion is far more indicative of their intent than what may be an ordinary, generally-accepted meaning in other contexts. 8 Dunnell Minn. Digest Contracts § 8.06(e) (2012) (In construing ambiguous agreements, the court should consider the context in which they were made, including the acts of the parties indicating what interpretation was placed on the agreement by the parties themselves. Thus, contemporaneous exposition of the contract is entitled to great, if not controlling, influence in ascertaining the intention of the parties.)

45

Second, the district court's construction ignores the context of the Retail Partner Agreement and the discussions leading up to it in which Sleepy's expressed concern about getting a second quality line that would put them at a competitive disadvantage. That background strongly indicates that "first quality" was intended to have Sleepy's proposed meaning. In construing a contract, the court should take into account the entire agreement as well as the context of the transaction. *Eveleth Taconite Co.*, 301 Minn. at 27-28, 221 N.W.2d at 161-62 (interpreting the meaning of a contract by "[c]onsidering the contracts as a whole, and having in mind the object and purposes of the parties in entering the contract.").

Accordingly, this Court should reverse the district court's clearly erroneous construction of § 4(a).

## III.

### THE DISTRICT COURT ERRED IN DISMISSING SLEEPY'S SLANDER *PER SE* CLAIMS.

#### A. Consent is not a Valid Defense to Sleepy's Slander Claims.

The district court dismissed all but one of Sleepy's claims for slander *per se* (the "Zaffron Claim") on the ground that the slanderous statements were supposedly "solicited" and therefore consented to solely because the secret shopper mentioned Sleepy's before the defamatory statements were made. That is

46

not the law and dismissal based on that incorrect view was erroneous. This Court reviews an issue of law *de novo*. *Millea v. Metro N. R.R. Co.,* 658 F.3d 154, 161 (2d Cir. 2011).

It is uncertain how one can seriously say that conducting an investigation such as Sleepy's did so that it could know whether it was being defamed by Select Comfort constitutes consent to defamation. It is a basic premise that "honest inquiry or investigation by a person who has been defamed about the existence, source, or nature of the defamation is not the equivalent to consent to its repetition." Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 8.2.8 (4th ed. 2012). Sleepy's was making such an honest inquiry. It could not effectively be made without some reference to the fact that Select Comfort beds were also on sale in Sleepy's stores. That is exactly what a consumer who saw the beds at Sleepy's or heard they were being sold there would be expected to do.

Although New York case law concerning a consent defense to slander is extremely meager, and the New York Court of Appeals has never addressed the issue, this Court must be guided by the New York decisions on point that, contrary to what the district court held, demonstrate that the initiation of an inquiry, even by an agent, does not, alone, constitute consent. In the words of one case:

> a plaintiff who had authorized an agent to make an
> inquiry on his behalf is not to be charged with consent to
> a defamatory statement made in reply to the inquiry,
> unless he had reason to anticipate that the response might
> be a defamatory one. Only in such a case can it be said
> that he had impliedly agreed to assume the risk of a
> defamatory communication to his agent.

*Teichner v. Bellan,* 7 A.D.2d 247, 251, 181 N.Y.S.2d 842, 846 (4th Dep't 1959)

(internal citations omitted).

*Park v. Lewis*, 139 A.D.2d 961, 528 N.Y.S.2d 250 (4th Dep't 1988) is an

instructive application of *Teichner*. There, Parke, an ophthalmologist, hired private

detectives to gather evidence from other ophthalmologists for his defense to

misconduct proceedings. During the detectives' first visit to Lewis' office, Lewis

allegedly made defamatory statements concerning Park. Park then sent the

detectives a second time to record additional statements. He then sued, asserting

two causes of action for slander. *Id*. at 961-62, 528 N.Y.S.2d at 251. After

affirming dismissal of the case on summary judgment on other grounds, the

Appellate Division stated:

> We note a further basis for dismissal of the *second cause
> of action*. Plaintiff in effect consented to the alleged
> defamatory statements by authorizing his agents to
> obtain further comment when he had reason to anticipate
> that defendant's responses to inquiries might be
> defamatory. That consent constitutes a complete defense
> to the *second cause of action.*

48

*Id.* at 962, 528 N.Y.S.2d at 251 (emphasis supplied) (citation omitted.) Significantly, consent was not a defense to the first cause of action – for the slander uttered on the first visit. This result crisply demonstrates that under New York law merely sending an agent as an investigator or, in this case, as a "shopper," who asks about the products at Sleepy's does not constitute consent to defamation or invited defamation. [11]

In this case, Sleepy's had reason *not* to expect defamation and was investigating whether it was occurring. First, the non-disparagement provision in the Retail Partner Agreement forbad defamation (A-1712) and Sleepy's was entitled to assume, and investigate whether, Select Comfort was complying with it. Second, after January 23, 2007, Sleepy's had express written assurances from Select Comfort's CEO that action had been taken to stop the defamatory conduct. (A-1722.)

---

[11] The cases the district court relied on are consistent with *Teichner* and *Park. Wells v. Belstrat Hotel Corp.,* 212 A.D. 366, 208 N.Y.S. 625 (1st Dep't 1925), involved an allegedly defamatory letter sent in response to a letter from the plaintiff's attorney asking for facts concerning an earlier slander of the plaintiff by defendant. The letter reiterated the prior defamation. In *Dickson v. Slezak,* 73 A.D.3d 1249, 1251, 902 N.Y.S.2d 206, 208 (3d Dep't 2010), the court cited *Park* and noted that the plaintiff consented to the defamation to his agent because he "had every reason to anticipate" that the defendant's comments would be defamatory. *LeBreton v. Weiss,* 256 A.D.2d 47, 47, 680 N.Y.S.2d 532, 532 (1st Dep't 1998), also followed *Park* and involved anticipated defamation.

49

In addition, Sleepy's' secret shoppers who heard the defamatory statements were not revisiting Select Comfort sales persons who were known to have already slandered Sleepy's to obtain more defamatory statements. Rather, they were attempting to determine whether the defamation was isolated or widespread. Thus, this case is analogous to the First Cause of Action in *Park,* to which consent was not a defense rather than the Second Cause of Action where the detectives returned a second time to procure more defamatory statements from the same individual who had already made them.

Accordingly, this Court should reverse the district court's dismissal of Sleepy's claims for slander *per se* insofar as it was based on the district court's application of the purported consent defense. Alternatively, given the lack of guidance from the New York Court of Appeals, and the relative dearth of lower state court decisions concerning a consent defense to slander, this Court should consider certification to the New York Court of Appeals pursuant to Local Rule 27.2(b), N. Y. Const. Art. VI § 3(b)(9) and New York Court of Appeals Rule 500.27, the issue of whether referring to the subject of the slander before the slander is uttered, alone, constitutes consent to the slander.

### B.  A Direct, Specific Attack on Sleepy's Integrity is not a Non-Actionable "Loose, Figurative or Hyperbolic" Statement.

The only slander *per se* claim that the district court did not dismiss as a matter of law as consented to was based on the statement "Call [Sleepy's] up and you'll find that Sleepy's will not honor [the warranty]" that the Select Comfort sales person made to secret shopper Deborah Zaffron on November 5, 2006 at the Select Comfort store in the Westfield Mall in Bay Shore, New York.  The district court found this statement of fact to be "'reasonably susceptible of defamatory connotation.'"  (SPA-43.)  However, the district court then purported to find that this direct, specific attack by a competitor on Sleepy's integrity and business practices, not in any way couched as opinion, was non-actionable as mere "loose" and "hyperbolic" words in "deprecating the plaintiff," relying on *Dillon v. City of New York*, 261 A.D.2d 34, 38 704 N.Y.S.2d 1, 5 (1st Dep't 1999).  That characterization of the statement is directly contrary to its plain import and clearly erroneous.

It is not rationally possible to analogize the "[l]oose, figurative or hyperbolic statements" found non-actionable in *Dillion* to the specific assertion that Sleepy's does not honor warranties.  *Dillon* involved statements made by an Executive Assistant District Attorney during an exit interview with a resigning assistant district attorney concerning another former ADA, the plaintiff, with whom she was

51

considering entering into law practice. The statements consisted of making deprecating facial expressions and head shaking when referring to the plaintiff and characterizing him using a non-specific, derogatory epithet consisting of an expletive and an anatomical part. 261 A.D.2d at 36-37, 704 N.Y.S.2d at 3-4. Such language conveys no specific information and is plainly opinion.

Nor does the distinction made between a statement of opinion that implies an undisclosed factual basis and a opinion accompanied by a recitation of facts on which it is based, referred to in *Penn Warranty Corp. v. DiGiovanni,* 10 Misc. 3d 998, 810 N.Y.S.2d 807 (Sup. Ct. N.Y. County 2005), and relied on by the district court (SPA-44) support the district court's finding. *Penn Warranty* involved statements made on a disgruntled customer's Internet "gripe site." The court there found "most compelling":

> [T]he fact that the Web site, when viewed in its full context, reveals that defendant is a disgruntled consumer and that his statements reflect his personal opinion based upon his personal dealing with plaintiff. They are subjective expressions of consumer dissatisfaction with plaintiff and the statements are not actionable because they are defendant's personal opinion.

(*Id.* at 1005, 810 N.Y.S.2d at 815.) Here, the context is completely different. The speaker is an agent of a competitor, not a consumer, and there is no indication that the statement is an opinion based on his personal dealings with Sleepy's. Quite the contrary, it is presented as a statement of fact. Accordingly, the distinction between

an opinion with an undisclosed factual basis and an opinion with a recitation of facts never even comes into play. The statement is not an opinion in the first place.

Finally, the statement cannot reasonably be characterized as "ambiguous," as it was by the district court (SPA-44), on the theory that Sleepy's inspector might legitimately find no defect in a bed and therefore deny a warranty claim without dishonoring the warranty. The fair import of the salesperson's statement was that Sleepy's would dishonestly claim that there was no defect and thereby dishonor the warranty. "It has long been the rule that words charged to be defamatory are to be taken in their natural meaning and that the courts will not strain to interpret them in their mildest and most inoffensive sense to hold them nonlibelous." *Mencher v. Chesley,* 297 N.Y. 94, 99 (1947) (Fuld, J.), *accord Rejent v. Liberation Publ'n., Inc.,* 197 A.D.2d 240, 242-43, 611 N.Y.S.2d 866, 867 (1st Dep't 1994). Here, the district court strained mightily to find a potential non-slanderous construction of the statement in issue and avoid its natural meaning. In so doing, the district court contravened the Court of Appeals' admonishment in *Mencher* and erred.

The district court's treatment of the Zaffron Claim betrays his underlying negative view of Sleepy's use of secret shoppers to prove its case and his predisposition, despite the evidence, to view salespersons' denigration of, and defamatory statements concerning, competitors as behavior inherent in competition that consumers entirely disregard and that has no effect on consumer purchasing

53

decisions. According to the district court, "[a]nyone who has ever shopped retail knows a salesperson is going to tell you loose and hyperbolic statements in an attempt to get you [to] purchase their merchandise." (SPA-43 through SPA-44) (*See also* 28, n. 10 above.)

The district court's view that denigration and defamation in the retail sale context can have no effect on consumer behavior is directly at odds with the evidence in the record and other evidence Sleepy's sought to submit but the district court excluded or struck described in Part IV below. The only support the district court cites is a few lines from a Hollywood movie he apparently saw, wholly outside the record. (SPA-44 through SPA-45.) The evidence in the record shows that neither party considered denigration of the other or its products to be harmless or of no effect on sales. In one instance when Sleepy's brought to Select Comfort's attention that its sales person was knocking the wood foundation at Sleepy's, Select Comfort apologized and represented that it gave the salesperson "coaching" to correct the behavior. (A-232 through A-233 (Tr.204:8-207:11).) Similarly, in January 2007, Select Comfort's CEO wrote that Select Comfort was "disappointed" by the contents of Sleepy's shop reports and took "immediate steps" to correct the disparagement. (A-1722.)

Further, evidence of consumers' state of mind that the district court refused to admit or struck would have shown that the denigration and defamation the district

54

court discounts does affect consumer behavior. Sleepy's sought to show several instances in which consumers cancelled sales of or returned Select Comfort beds at Sleepy's giving as the reason that they were told at the Select Comfort store that the Select Comfort beds at Sleepy's were inferior to those at the Select Comfort store. As explained below (at 55-64) the exclusion of this evidence was erroneous and materially prejudiced Sleepy's ability to present its case fairly.

## IV.

## THE DISTRICT COURT'S INCONSISTENT AND ERRONEOUS EVIDENTIARY RULINGS MATERIALLY PREJUDICED SLEEPY'S AND REQUIRE A NEW TRIAL.

The district court erroneously refused to admit, or struck, two types of evidence Sleepy's sought to offer:

(a)     evidence that customers stated to Sleepy's that they wished to return or cancel purchases of Select Comfort beds from Sleepy's  because they were told at the Select Comfort store that the Select Comfort beds at Sleepy's were inferior, offered under the state of mind exception to the hearsay rule, Fed. R. Evid. 803(3) (the "Customer State of Mind Evidence"); and

(b)     audio recordings of secret shops during which Select Comfort salespersons denigrated the Select Comfort beds at Sleepy's and Sleepy's itself (the "Shop Recordings").

55

The exclusion of this important evidence prejudiced Sleepy's substantial rights, and likely affected the outcome of the case because it would have shown, contrary to the district court's view not based on anything in the record, that disparaging statements by Select Comfort's sales force about the Select Comfort line of beds sold at Sleepy's do, in fact, affect customers' purchasing decisions.

This Court reviews a district court's evidentiary rulings for abuse of discretion. *United States v. White,* 692 F.3d 235, 244 (2d Cir. 2012); *Tesser v. Bd. of Educ.* 370 F.3d 314, 318 (2d Cir. 2003). A District Court abuses its discretion in evidentiary rulings when, *inter alia,* "its decision rests on an error of law (such as application of the wrong legal principle) . . . ." *Zervos v. Verizon N.Y. Inc.,* 252 F.3d 163, 169 (2d Cir. 2001), *accord, White,* 692 F.3d at 244; *United States v. Figueroa,* 548 F.3d 222, 226 (2d Cir. 2008). An erroneous evidentiary ruling is not harmless, and justifies grant of a new trial, when it implicates a substantial right of the appellant. A substantial right is implicated when "'it is likely that in some material respect the factfinder's judgment was swayed by the error.'" *Tesser*, 370 F.3d at 319, quoting *Costantino v. David M. Herzog, M.D., P.C.,* 203 F.3d 164, 174 (2d Cir. 2000). As demonstrated below, the district court's evidentiary rulings excluding or striking Customer State of Mind Evidence and certain Shop Recordings were erroneous and non-harmless under the above standards.

## A.  Erroneous Exclusion of Customer State of Mind Evidence.

Sleepy's sought to offer Customer State of Mind Evidence through four witnesses:

James Constantinides, a Sleepy's Regional Manager, testified that on at least two different occasions he spoke on the telephone with Sleepy's customers who canceled their purchase of Select Comfort beds from Sleepy's, giving as their reasons that, while speaking to Select Comfort sales persons, they were told that the Select Comfort beds sold at Sleepy's were inferior to the models sold at Select Comfort stores.  (A-393 through A-395 (Tr.563:14-564:6; 564:23-566:21); (A-(Tr.566:23-572:7).) The district court sustained objection in material part to Mr. Constantinides' testimony described above as inadmissible hearsay (A-394 (Tr.566:5-9)) or did not take it as customer state of mind testimony (A-395 (Tr.571:11-13).)

Deborah Zaffron, a former Sleepy's sales person, testified that a Sleepy's customer purchased a Select Comfort bed at Sleepy's, but later returned and canceled the sale, giving as their reason that, while speaking to a Select Comfort salesperson at a store located in the same shopping mall, they were told that the merchandise was inferior.  (A-431.4 through A-431.5 (Tr.678:13-683:16).)  Ms. Zaffron then called the Select Comfort representative and put him on a speaker phone with the customer present.  (A-431.5 (Tr.682:19-683:5).)  During that

57

conversation, the Select Comfort employee repeated the derogatory statements, and told Ms. Zaffron and the customer "many negative things about the Select Comfort [bed] that Sleepy's sells," including that the Select Comfort beds at Sleepy's were inferior to the beds at the Select Comfort store. (A-431.5 (Tr.683:6-16).) The district court struck in material part Ms. Zaffron's testimony as inadmissible because the witness was not able to identify the particular customer involved by name. (A-431.4 (Tr.680:4-9).)

Tyler Paiva, a Sleepy's District Operations Manager, testified that on at least two different occasions he personally met with Sleepy's customers who canceled their purchase of Select Comfort beds from Sleepy's, giving as their reasons that, while speaking to Select Comfort sales persons, they were told that the foundations sold at Sleepy's were inferior to the foundations sold at Select Comfort stores. (A-579 through A-581 (Tr.1205:5-1213:23).) The district court sustained objection in material part to Mr. Paiva's testimony described above as inadmissible hearsay because the witness was not able to identify the customers involved. (A-581 (Tr.1213:5-23).)

Scott Cheshul, a Sleepy's senior regional sales manager, testified in making an offer of proof that he personally met with a named Sleepy's customer who wanted to cancel his purchase of a Select Comfort bed from Sleepy's, giving as his reason that, while speaking to Select Comfort sales persons, he was told that the

58

Select Comfort beds sold at Sleepy's were inferior to the models sold at Select Comfort stores, and that Sleepy's had been overcharged for it. Mr. Cheshul testified that he gave the customer a $500 discount. (A-916 through A-923 (Tr.2027:10-2057:2).) The district court struck in material part Cheshul's testimony described above as inadmissible hearsay that was not subject to the state of mind exception. (A-917 through A-923 (Tr.2030:23-2047:11; 2050:22-2052:17; 2055: 9-20; 2056:15-2057:2).)

In excluding this evidence, the district court applied an incorrect legal principle in making its evidentiary rulings. The evidence is admissible to show the customers' state of mind in deciding not to do business with Sleepy's, and it is not required that the customer be identified by name or testify personally.

Out-of-court statements that customers made to Sleepy's employees are admissible to show customer state of mind or motive under Fed. R. Evid. 803(3). This rule provides that:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
>        *      *      *
>
> (3) Then-Existing Mental, Emotional, or Physical Condition. A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) . . . .

Rule 803(3) applies even if the declarant is unidentified.

59

A customer's statement of the reasons for not wanting to purchase, or consummate the purchase of, a Select Comfort bed from Sleepy's (for example, because the customer was told at the Select Comfort store that the Sleepy's beds are inferior) shows the customer's state of mind and is admissible under Rule 803(3) for that purpose. It is well established that the state of mind exception "applies in actions for damage to business, where statements by customers are admitted to show the effect on them, in deciding whether to continue dealing with the business, of particular conduct or threatened conduct." Miller & Kirkpatrick, *Federal Evidence* § 8:71. In such situations, statements of customers, including unidentified customers, are admissible under Rule 803(3) to show the customers' state of mind. *E.g., Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.,* 111 F.3d 993, 1003-04 (2d Cir. 1997) (customer statements admitted under 803(3) to show that customers were confused by similar trade dress); *Callahan v. A.E.V., Inc.,* 182 F.3d 237, 252 (3d Cir. 1999) (customer statements, including statements of unidentified customers, admitted under 803(3) to show effect of defendants' actions on customer's purchasing decisions); *Herman Schwabe, Inc. v. United Shoe Mach. Corp.,* 297 F.2d 906, 914 (2d Cir. 1962) (statements of customer as to his reasons for not dealing with a supplier admissible for purpose of showing motive or reason); *Regscan, Inc. v. Brewer,* No. 04-6043, 2007 U.S. Dist. LEXIS 20087, at *17-18 (E.D. Pa. Mar. 16, 2007) (same).

60

In *Callahan v. A.E.V., Inc.,* the Third Circuit held that the plaintiffs should have been permitted, under Rule 803(3), to testify to statements customers made indicating that they switched, or planned to switch, their business from plaintiffs' to defendants' stores due to actions of the defendants. 182 F.3d at 250-54. The court specifically held that "we do not think that the fact that the declarants are not specifically identified is relevant for determining whether their statements fall within the Rule 803(3) hearsay exception." *Id.* at 252 n.11.

Accordingly, in refusing to consider the Customer State of Mind Evidence on the ground that the customer was not identified the district court applied an incorrect legal standard and therefore abused his discretion. The error was highly prejudicial to Sleepy's and materially swayed the district court's judgment. As noted above (at 54), based on nothing in the record, and relying on nothing more than a snippet of dialogue from a movie, the district court heard and decided this case under a pre-determined, prejudicial view that consumers would entirely disregard derogatory statements by Select Comfort salespersons concerning the Select Comfort products at Sleepy's in making purchasing decisions. This trivialized Sleepy's case in the district court's eyes. The Customer State of Mind Evidence would have made that prejudicial view impossible to square with the record. It shows that customers do, in fact, view derogatory statements by Select Comfort salespersons about the Select Comfort beds at Sleepy's as a motive or

reason not to purchase them from Sleepy's but rather from the Select Comfort store.

## B. Erroneous Exclusion of Shop Recordings.

A relatively small number of the secret shops were recorded by the Sleepy's secret shopper using a recording device. Sleepy's offered 15 of these Shop Recordings in evidence. For each, Sleepy's laid the evidentiary foundation this Circuit requires by eliciting from the secret shopper who made the recording and engaged in the conversation testimony showing that the recording accurately reflects the dialogue during the secret shop between the secret shopper and the Select Comfort sales person. Fed. R. Evid. 901(a), (b)(1); *see also United States v. Hamilton,* 334 F.3d 170, 186-87 (2d Cir.), *cert. denied,* 540 U.S. 985 (2003). However, the district court admitted only 8 of the shop recordings offered (Px 3.4 (A-1514); A-431.26 (Tr.768:14-769:2); Px 3.5 (A-1514); A-431.21 (Tr.746:22-747:9); Px 3.6 (A-1514); A-431.18 (Tr.735:7-736:7); Px 3.11 (A-1516); A-400 (Tr.591:1-2); A-401 (Tr.594:4-8); Px 3.15 (A-1518); A-641 through A-642 (Tr.1323:5-1325:1); Px 3.16 (A-1519); A-431.23 (Tr.755:18-23); Px 3.17 (A-1519); A-431.12 (Tr.712:25-713:8); A-517 through A-518 (Tr.1024:19-1030:18)); Px 3.18 (A-1518); A-431.29 through A-431.30 (Tr.780:25-782:17)) and sustained objection to 7 others. (Px 3.1 (A-1513); A-786 (Tr.1657:14-1658:7); Px 3.2 (A-1513); A-763 (Tr.1683:1-1639:2); Px 3.3 (A1513); A-773 (Tr.1678:9-19); Px 3.7

(A-1515); A-726 through A-727 (Tr.1558:5-1561:23); Px 3.8 (A-1515); A-719 through A-720 (Tr.1529:6-1532:5); Px 3.9 (A-1515); A-731 (Tr.1575:22-1576:14); Px 3.12 (A-1517); A-559 through A-560 (Tr.1126:11-1127:11).) The recordings for which the district court sustained objections had been authenticated with the same evidentiary foundation that supported the admission of other Shop Recordings. (Px 3.1 (A-1513); A-766 through A-768 (Tr.1649:7-1659:14); Px 3.2 (A-1513); A-761 through A-765 (Tr.1630:5-1637:25; 1639:3-1647:25); Px 3.3 (A-1513); A-769 through A-773 (Tr.1663:14-1678:7); Px 3.7 (A-1515); A-723 through A-726 (Tr.1546:7-1558:4); Px 3.8 (A-1515); A-717 through A-719 (Tr.1519:5-1529:5); Px 3.9 (A-1515); A-728 through A-731 (Tr.1564:22-1575:23); Px 3.12 (A-1517); A-555 through A-559 (Tr.1110:15-1126:10).) As to the Shop Recordings refused admission despite proper authentication, the district court applied an incorrect, unarticulated legal principle and thus abused his discretion.

In *United States v. Hamilton,* 334 F.3d 170, 186 (2d Cir.), *cert. denied,* 540 U.S. 985 (2003), this Court held that "[a] tape recording may be admitted in evidence when it has been properly authenticated 'by evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *Id.* (quoting Fed. R. Evid. 901(a)). The testimony of the witness who heard the conversation and made the recording, showing that the recording accurately

63

reflects what was said during the conversation is sufficient to authenticate the recording and support its admission. *Id.* at 186-87. Under this standard, each of the Shop Recordings should have been admitted in evidence.

The district court's inconsistent application of the relevant legal principle to keep Shop Recordings that show firsthand the interactions between the secret shopper and the Select Comfort sales persons out of the record affects a substantial right in this case in view of the district court's predisposition to discount the possibility that Select Comfort's disparagement of the Select Comfort beds at Sleepy's would affect customer purchasing decisions and drive sales from Sleepy's to Select Comfort's stores. Even though the district court heard the testimony of the secret shoppers concerning what happened during the shops, hearing the actual voices and interactions between the shopper and the sales person might well have swayed the district court's view that the Select Comfort sales persons' campaign of disparagement was just "loose and hyperbolic" sales talk that consumers entirely discount (SPA-43 through SPA-44).

## CONCLUSION

For the foregoing reasons, the decision of the district court should be reversed and a new trial ordered.

Dated: New York, New York
February 11, 2013

Respectfully submitted,

_____ /S/ Vincent J. Syracuse_____
Vincent J. Syracuse
L. Donald Prutzman
George F. du Pont
TANNENBAUM HELPERN
SYRACUSE & HIRSCHTRITT LLP
900 Third Avenue
New York, New York 10022
(212) 508-6700
*Attorneys for Plaintiff-Appellant*

**CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32(a)**

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). It contains 13,956 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman.

Dated:  February 11, 2013