**12-4437-cv**
**Sleepy's v. Select Comfort**

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2013

(Argued: August 21, 2013          Decided: February 27, 2015)

Docket No. 12-4437-cv

-----------------------------------------------------------X

SLEEPY'S LLC,

*Plaintiff-Appellant*,

v.

SELECT COMFORT WHOLESALE CORPORATION, SELECT COMFORT RETAIL CORPORATION, SELECT COMFORT CORPORATION,

*Defendant-Appellees*.

-----------------------------------------------------------X

Before: LEVAL, WESLEY, and HALL, *Circuit Judges*:

Plaintiff Sleepy's, LLC appeals from the judgment of the United States District Court for the Eastern District of New York (Platt, *J.*) granting judgment on partial findings for Defendant Select Comfort. The Court of Appeals (Leval, *J.*) concludes that the district court's dismissal of some of Sleepy's contract-based claims (disparagement, breach of the implied covenant of good faith and fair dealing, and unfair competition) was based on an erroneous interpretation of the contract. The judgment as to those claims is VACATED. The judgment dismissing Sleepy's claims of slander *per se* is also VACATED. The dismissal of the remaining contract claims is AFFIRMED.

REMANDED for further proceedings.

VINCENT J. SYRACUSE (L. Donald Prutzman,
George F. du Pont, *on the brief*), Tannenbaum
Helpern Syracuse & Hirschtritt LLP, New York,
New York, for *Plaintiff-Appellant*.

**12-4437-cv**
**Sleepy's v. Select Comfort**

ANDREW S. HANSEN (Heidi A.O. Fisher, Michelle R. Schjodt, *on the brief*), Oppenheimer Wolff & Donnelly LLP, Minneapolis, Minnesota, for *Defendant-Appellees*.

LEVAL, *Circuit Judge*:

Plaintiff Sleepy's, LLC appeals from the judgment of the United States District Court for the Eastern District of New York (Platt, *J.*) in favor of Defendant Select Comfort[1] rendered upon a bench trial. This action arises out of a contractual agreement between Sleepy's and Select Comfort pursuant to which Sleepy's sold beds manufactured by Select Comfort. After the parties ended their business relationship, Sleepy's brought suit, asserting numerous claims, including claims for breach of contract, breach of the contract's implied covenant of good faith and fair dealing, unfair competition, and slander *per se*.

The case proceeded to a bench trial in the spring of 2012. In June 2012, toward the end of Sleepy's presentation of its case, Select Comfort moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c).[2] The district court granted judgment for Select Comfort on all claims. The court's dismissal of many of Sleepy's contract-based claims depended on its determination that the contract had expired on September 30, 2006, and, by its

---

[1] The defendants are Select Comfort Wholesale Corporation, Select Comfort Retail Corporation, and Select Comfort Corporation. We refer to them collectively as "Select Comfort."

[2] Under Federal Rule of Civil Procedure 52(c),
> [i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim . . . that, under the controlling law, can be maintained . . . only with a favorable finding on that issue.

Fed. R. Civ. P. 52(c).

**12-4437-cv**
**Sleepy's v. Select Comfort**

1   terms, could not be extended past that date except by written waiver. The court dismissed the

2   claims of defamation primarily on the ground that Sleepy's had consented to the allegedly

3   slanderous statements. On appeal, Sleepy's contends these rulings were based on errors of law.

4   Sleepy's also challenges several of the district court's evidentiary rulings.

5       We affirm the judgment dismissing one of the contract claims. As for the other claims,

6   we vacate the judgment and remand for further proceedings.

7                                    **BACKGROUND**

8       Plaintiff Sleepy's, LLC is a New York-based retailer of mattresses and bedding products.

9   Defendant Select Comfort, based in Minnesota, manufactures and sells a line of bedding called

10  the Sleep Number, which is known as "alternative bedding" because, unlike traditional spring-

11  filled mattresses, Select Comfort's Sleep Number beds are filled with inflatable air chambers

12  that can be adjusted to vary the firmness of the mattress. Select Comfort sells its Sleep Number

13  beds through its own retail stores.

14      In October 2000, Select Comfort launched a Retail Partner Program to sell Sleep Number

15  beds in the stores of other retailers. Sleepy's began negotiations with Select Comfort in early

16  2005 to join the Retail Partner Program. In June 2005, Sleepy's and Select Comfort executed a

17  written Dealer Agreement (the "Dealer Agreement") making Sleepy's an authorized retailer of

18  Sleep Number beds.

19      Under the terms of the Dealer Agreement, the only Select Comfort merchandise to be

20  sold by Sleepy's was the "Personal Preference" line. In contrast, Select Comfort sold its "Core"

21  line in its company-owned retail stores. The Personal Preference and Core lines differed from

3

1    one another in several respects, including differences of foundation and of controls to adjust

2    firmness. The foundation of the Personal Preference beds sold by Sleepy's was wooden; the

3    Core beds had a plastic polymer foundation. The controls of the Personal Preference line were

4    wired, while the Core line came with wireless remote controls.

5        The Dealer Agreement between Sleepy's and Select Comfort in Section 4(a) required

6    Select Comfort to provide Sleepy's with "first quality merchandise . . . meeting all mutually

7    agreed upon specifications." Joint App'x ("JA") at 1712. In Section 4(c), each side agreed not to

8    "adversely affect the character, reputation and good will (collectively the 'Brand Image') of the

9    other party." *Id.* Section 9 provided, "Subject to earlier termination in accordance with any

10    provision of this Agreement, the term of this Agreement . . . will expire September 30, 2006." JA

11    1715.

12        Sleepy's began selling Sleep Number beds in August 2005. Sales were disappointing. In

13    response to reports it received that Select Comfort salespeople were disparaging Sleepy's and its

14    Personal Preference line, in late 2006 Sleepy's began conducting "secret shops," sending hired

15    personnel into Select Comfort stores posing as customers to assess whether this was true.

16    Sleepy's contends its undercover shopping revealed a regular pattern of disparagement. In

17    particular, Sleepy's presented evidence that Select Comfort's salespeople told Sleepy's secret

18    shoppers that the wooden foundation sold at Sleepy's was inferior to the plastic polymer

19    foundation of the Core line sold at Select Comfort stores; that beds sold at Sleepy's were stored

20    in warehouses where they attracted allergens and dust mites, while beds sold through Select

21    Comfort's stores were made to order; and that Sleepy's offered inferior sales terms and

22    deceitfully refused to honor its warranties.

1      At a meeting on January 3, 2007, Sleepy's presented Select Comfort with results of some

2 of its secret shops. Sleepy's continued to conduct additional secret shops thereafter. On January

3 11, 2007, Select Comfort sent Sleepy's a letter stating that it saw "no reason to extend the term

4 of [the parties'] Agreement" and wanted to "wind-up . . . the dealer relationship." JA 1590. The

5 letter proposed that Sleepy's "continue to sell its remaining inventory of Select Comfort product

6 through the end of February, following which [Select Comfort would] arrange for the timely

7 retrieval of [its] merchandising materials and fixtures." *Id.* On April 18, 2007, the parties entered

8 into a Wind-Up Agreement (the "Wind-Up Agreement"), which provided that between April 30

9 and May 11 Select Comfort would retrieve all Select Comfort materials from Sleepy's stores and

10 warehouses. Under the Wind-Up Agreement, Select Comfort agreed to "fill all Sleepy's orders"

11 until two weeks before the final date of product removal, subject to certain limitations, and

12 Sleepy's agreed to "operate according to the terms and conditions of [the parties'] previous

13 agreement during this period . . . ." JA 1675-76.

14 **PROCEDURE**

15      On August 24, 2007, Sleepy's began this suit in New York state court. Select Comfort

16 removed the case to federal court on the basis of diversity of citizenship. Sleepy's complaint

17 alleged that Select Comfort breached the Dealer Agreement by failing to provide it with "first

18 quality merchandise," as required by the agreement, and by violating the Dealer Agreement's

19 non-disparagement clause. Sleepy's also asserted claims of fraudulent inducement, slander *per*

20 *se*, breach of the implied covenant of good faith and fair dealing, unfair competition, and

21 violation of the Lanham Act. After several months of trial, toward the end of Sleepy's

22 presentation of its case, Select Comfort made its motion for judgment on partial findings

1     pursuant to Federal Rule of Civil Procedure 52(c). On September 26, 2012, the district court,

2     acting as fact-finder, found in Select Comfort's favor on all claims. This appeal followed.[3]

3     **DISCUSSION**

4     We review the district court's findings of fact for clear error and its conclusions of law de

5     novo. *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 157 F.3d 956, 960 (2d Cir. 1998).

6     **I.       Breach of Contract Claims**

7     Sleepy's alleged that Select Comfort breached § 4(a) of the Dealer Agreement by failure

8     to deliver "first quality merchandise" and § 4(c) by disparaging Sleepy's merchandise and

9     business practices. We agree with the district court that Sleepy's failed to prove a breach of

10    § 4(a), and we therefore affirm the dismissal of the claim based on that provision. As for the

11    claim under § 4(c), however, the district court erred in construing the Dealer Agreement as

12    barring extension of the contract term past the stated expiration date except by written waiver,

13    and dismissing the claim on that basis.

14    **(a) Section 4(a) – First Quality Merchandise**

15    Sleepy's contends its evidence showed that Select Comfort breached the requirement of

16    § 4(a) of the Dealer Agreement that Select Comfort provide Sleepy's with "first quality

17    merchandise." The parties dispute the meaning of "first quality." Relying on evidence from the

18    contract negotiation, Sleepy's maintains that this term required Select Comfort to provide it with

19    beds that were in no way inferior to the beds sold at Select Comfort stores. Select Comfort

20    contends the generally accepted meaning of the term in product manufacturing is "new,

21    unflawed products which are distinguished from defective or damaged goods." *Sleepy's LLC v.*

---

[3] Sleepy's has not challenged the district court's dismissal of its fraudulent inducement and Lanham Act claims on appeal.

*Select Comfort Wholesale Corp.*, No. 07-CV-4018, slip op. at 11 (E.D.N.Y. Sept. 26, 2012). The district court found the term ambiguous and, acting as fact-finder, adopted Select Comfort's construction. The court further found that Select Comfort did not breach its obligation to provide Sleepy's with new, unflawed products.

We need not decide whether the district court properly interpreted the term "first quality." Even if Sleepy's is correct that this clause required Select Comfort to deliver to Sleepy's merchandise that was in no way inferior to what Select Comfort sold in its own stores, Sleepy's failed to establish a breach. The district court found that Sleepy's failed to show that the Personal Preference beds it received were of inferior quality to Select Comfort's Core line. We find no flaw in that ruling. Accordingly, we affirm the district court's grant of judgment for Select Comfort on this claim.

**(b) Section 4(c) – Non-Disparagement Clause**

In its second breach of contract claim, Sleepy's alleges that Select Comfort breached the non-disparagement clause of § 4(c) of the Dealer Agreement. Section 4(c) provides, in relevant part:

> Each party represents that it shall not impair, infringe upon or adversely affect the character, reputation and good will (collectively, the "Brand Image") of the other party[.]

JA 1712. The district court ruled that Sleepy's failed to prove a breach of § 4(c) because it presented no competent evidence of disparagement by Select Comfort that took place *while the Agreement was in effect*.

The district court's ruling was predicated on its interpretation of two subsections of the Dealer Agreement. Section 9(a) states that "the term of this Agreement . . . will expire

**12-4437-cv**
**Sleepy's v. Select Comfort**

1   September 30, 2006." JA 1715. Section 9(e) provides that, "after termination" of the Agreement,

2   the terms of the Agreement cannot be extended or continued except "by an express written

3   waiver of termination signed by the terminating party."[4] *Id.* Taken together, the district court

4   understood these provisions to mean that the Agreement would come to an end on September 30,

5   2006, and could not be extended beyond that date except by written waiver, which the court

6   concluded was not shown. The court accordingly concluded that the Dealer Agreement was no

7   longer in force after September 30, 2006, and that disparagements by Select Comfort subsequent

8   to that date could not be breaches of the contract.

9        The court thus treated "expiration" and "termination" as interchangeable terms referring

10  to the end of the contract term, regardless of how it occurred. Sleepy's argues that the court

11  failed to recognize the contract's carefully drawn distinction between "expiration," which refers

12  to the arrival of the date contractually specified as the end of the contract's term, and

13  "termination," meaning the act of a party, relying on a contractual justification, to bring the

14  contract term to a premature end.

15       We agree with Sleepy's that the court's construction of the contract was erroneous. The

16  Dealer Agreement does indeed use those terms to refer to different ways of ending the contract

17  term. "Expiration" is used to refer to the end of a pre-determined "Initial Term" on a

---

[4] Section 9(e) reads in full:

> Waiver of Termination. The conduct by either of the parties after termination of this Agreement, including without limitation any sale of the Products, will not be construed as a waiver of the termination of this Agreement or as an extension or continuation of the term of this Agreement beyond the period specified in the notice of termination; any such termination of this Agreement may only be waived by an express written waiver of termination signed by the terminating party.

JA 1715.

8

1  contractually agreed date. This was provided in Section 9(a), which states, "*Subject to earlier*

2  *termination . . .* , the term of this Agreement shall commence as of the Effective Date and will

3  *expire* September 30, 2006 (the "Initial Term")." JA 1715 (emphases added).[5]

4      In contrast, "termination" is used to describe an affirmative act by a party, relying on a

5  contractually agreed justification, to end the Agreement prior to its expiration. (Section 9(c)

6  permits a party to "terminate[]" the Agreement for cause upon a material breach by the other

7  party by serving a written "notice of termination." *Id.* Section 9(d) allows a party to

8  "terminate[]" the Agreement by giving a written "notice of termination" if, *inter alia*, the other

9  party becomes bankrupt, insolvent, or under control of a receiver. *Id.* And § 9(a), as quoted

10  above, provides that the contract's expiration (on September 30, 2006) is "[s]ubject to earlier

11  termination.")

12      Section 9(e) (which is quoted in full in footnote 4), in which the district court found a

13  prohibition of extension of the contract term absent an "express written waiver," applies only

14  "after *termination* of this Agreement," which had not occurred when the agreement came to its

15  expiration date. In addition, the type of written waiver specified in § 9(e) is a "written waiver *of*

16  *termination*." Furthermore, § 9(e) requires that the express written waiver of termination be

17  "signed *by the terminating party*," a provision that makes no sense if applied to extension of the

---

[5] Section 9(b), titled "Renewal Periods," uses "expiration" similarly. It states: "At least sixty (60) days prior to the *expiration* of the Initial Term, Select Comfort will, at its sole discretion, provide [Sleepy's] our proposed Retail Partner Agreement." JA 1715 (emphasis added). There would be no way for Select Comfort to comply with this provision if the terms "expiration" and "termination" did not refer to different occurrences, as Select Comfort could not know sixty days in advance when a termination might occur.

**12-4437-cv**
**Sleepy's v. Select Comfort**

1 contract term after expiration, because expiration happens automatically on the arrival of the

2 expiration date, and not at the instigation of any "terminating party."[6]

3   In sum, § 9(e) did not prevent the Dealer Agreement from being extended by the parties'

4 conduct after the Agreement's Initial Term expired on September 30, 2006. The district court's

5 conclusion that Sleepy's could not prevail on its claim of breach of contract by disparagement

6 because Sleepy's failed to show disparagement prior to the Dealer Agreement's expiration date

7 was based on an invalid interpretation of the agreement. The court did not confront Sleepy's

8 contention that the Dealer Agreement was in fact extended by conduct of the parties and that

---

[6]We have also considered all the other instances in which the terms "expire" and "terminate" were used in the contract and all support the interpretation of the contract that we adopt here. While we acknowledge that some of the contract's usages of the noun form, "termination," if viewed in isolation, could refer to expiration, the contract uses the verb "terminate" only in its transitive form, which does not share the same meaning as "expire." Within the context of the contract, it is clear that termination refers to one party taking action, while expiration refers to the contractually specified end date of the contract. At no point does the language in the contract support the inference that "termination" refers also to the arrival of the date specified in the contract as its expiration date.

  It makes perfect sense for such a contract to require a written waiver signed by the terminating party when the contract is prematurely terminated as the result of the other side's breach or default, and not to require a written, signed waiver for extension beyond simple expiration of the originally conceived duration. Because termination is forcibly inflicted on the other party without its agreement, there is every reason for the terminating party to want assurance that its termination will remain in effect unless it has explicitly agreed to restore the contractual term. In contrast, if the parties continue to function in their relationship after the expiration date as if the contract remained in force, for example, by Sleepy's continuing to sell Select Comfort merchandise, and Select Comfort continuing to deliver new merchandise to Sleepy's, a requirement of written waiver to extend the contract term, as opposed to inferring extension from the conduct of the parties, would result in the disappearance, which might take one or both of the parties by surprise, of all the previously agreed terms governing their relationship. While the parties to such a contract relationship might desire such a definitive cutoff of the contract relationship, they would of course be free to provide for it. In this case, it is clear the Dealer Agreement prohibited consensual extension of the contract term through conduct (absent a signed waiver) following a termination, but not upon the mere expiration of the period contractually specified as the duration of the contract term.

**12-4437-cv**
**Sleepy's v. Select Comfort**

1  Select Comfort disparaged Sleepy's in breach of § 4(c) while the Agreement was still in force.[7]

2  We therefore vacate the judgment dismissing Sleepy's claims of disparagement in breach of

3  contract. The court will need to rule on those issues on remand.

4  **II.     Unfair Competition and Breach of the Implied Covenant of Good Faith and Fair**
5          **Dealing**

6          Sleepy's also challenges the district court's grant of judgment for Select Comfort on

7  Sleepy's claims for unfair competition and breach of the implied covenant of good faith and fair

8  dealing.[8] Both claims are based, broadly speaking, on Sleepy's allegations that regardless of

9  whether Select Comfort's disparagements violated § 4(c), this and other hostile conduct violated

10  Select Comfort's implied obligations to refrain from unfair competition and of good faith and

11  fair dealing during the contract term. As with Sleepy's claim for breach of § 4(c) of the

12  Agreement, the district court granted judgment for Select Comfort on these claims on the

13  grounds that Sleepy's had presented no evidence of hostile conduct that took place prior to the

14  expiration date of September 30, 2006.

15          As discussed above, the district court erred in ruling that the Agreement could not be

16  extended except by written waiver and therefore necessarily ended on September 30, 2006.

17  Accordingly, we vacate the district court's grant of judgment for Select Comfort on Sleepy's

---

[7] Under Minnesota law, which governs the Agreement, "[w]hen a contract governs the duties of the parties for a specified term and it has expired, the parties may thereafter enter into a new contract by conduct (continued payment and performance) or otherwise . . . ." *Bolander v. Bolander*, 703 N.W.2d 529, 542 (Minn. Ct. App. 2005).

[8] Under Minnesota law, most contracts include an implied covenant of good faith and fair dealing. *Columbia Cas. Co. v. 3M Co.*, 814 N.W.2d 33, 36 (Minn. Ct. App. 2012). That covenant "require[s] that one party not unjustifiably hinder the other party's performance of the contract." *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995) (internal quotation marks omitted). The implied covenant of good faith and fair dealing does not extend to "actions beyond the scope of the underlying contract." *Id.* at 503.

1 claims for unfair competition and breach of the implied covenant of good faith and fair dealing

2 and remand for further consideration.[9]

3 **III.     Slander *Per Se***

4          Sleepy's asserted claims of slander *per se*, alleging that Select Comfort salespersons had

5 a practice of defaming Sleepy's merchandise and business practices. Sleepy's undertook to prove

6 defamation through testimony of its "secret shoppers" relating twelve instances of what was said

7 to them by salespersons in Select Comfort stores. The district court dismissed the slander claims,

8 ruling that none of the twelve statements was actionable. As to eleven instances, this was

9 because Sleepy's undercover shopper had been the first to mention the fact that Sleepy's stores

10 also sold Select Comfort merchandise or had asked questions about Sleepy's to find out what

11 Select Comfort would say in response. On that basis, the district court ruled that Sleepy's

12 solicited the allegedly defamatory statements and was therefore deemed in law to have consented

13 to them, which precluded suit. As to a final instance (the "Zaffron claim"), the court concluded

14 that they were not defamatory because a reasonable listener would not have believed that they

15 asserted *facts*, as opposed to mere hyperbolic, non-actionable sales talk. We believe that these

16 rulings were based on an incorrect understanding of the New York law of defamation.[10]

---

[9] In the alternative, Select Comfort argues that Sleepy's good faith and fair dealing claim must be dismissed because it is based on the same underlying conduct as Sleepy's breach of contract claims. Minnesota law, however, permits a party to plead an implied covenant of good faith and fair dealing claim in addition to a breach of contract claim, even if the two claims are based on the same conduct, though the party may not recover duplicative damages under both theories. *See Columbia Cas. Co.*, 814 N.W.2d at 37.

[10] Although some of the secret shops took place in Select Comfort stores in states other than New York, the parties appear to have agreed that this issue should be governed by New York law.

**12-4437-cv**
**Sleepy's v. Select Comfort**

1    **(a)    Consent to Defamation**

2    Decisions of New York's intermediate appellate courts have established that

3    the consent of the person defamed to the making of a defamatory statement bars that person from

4    suing for the defamation, and that, in some circumstances, a person's intentional eliciting of a

5    statement she expects will be defamatory can constitute her consent to the making of the

6    statement. *See Dickson v. Slezak*, 902 N.Y.S.2d 206, 208 (3d Dep't 2010); *LeBreton v. Weiss*,

7    680 N.Y.S.2d 532, 532 (1st Dep't 1998); *Handlin v. Burkhart*, 632 N.Y.S.2d 608, 609 (2d Dep't

8    1995); *Park v. Lewis*, 528 N.Y.S.2d 250, 251 (4th Dep't 1988). What is less clear is what

9    circumstances will justify the imputation of consent from the eliciting of the defamatory

10   statement and thus render the statement not actionable. The unclarity of New York law results

11   from the fact that the precedents are few, the formulations of the New York courts to have ruled

12   are not entirely consistent, and New York's highest court has never ruled on this precise

13   question.

14   The contours and purposes of the rule are somewhat illuminated by the Restatement

15   (Second) of Torts (1977), which in defamation cases has been cited with approval by the highest

16   court of New York. *See, e.g.*, *Liberman v. Gelstein*, 80 N.Y.2d 429, 434-35, 437-39 (1992); *Park*

17   *Knoll Assocs. v. Schmidt*, 59 N.Y.2d 205, 208-09 (1983). Section 583 of the Restatement

18   provides, "Except as stated in § 584, the consent of another to the publication of defamatory

19   matter concerning him is a complete defense to his action for defamation." *Comment d* to this

20   Section says, "It is not necessary that the other know that the matter to the publication of which

21   he consents is defamatory in character. It is enough that . . . he has reason to know that it may be

22   defamatory." As an illustration, the Restatement notes that a summarily discharged school

1  teacher who "demands that the reason for his dismissal be made public . . . has consented to the

2  publication [of the reason] though it turns out to be defamatory." Restatement (Second) of Torts

3  § 583 cmt. d (1977).

4  Section 584, which furnishes an exception to the rule of Section 583, provides, "An

5  honest inquiry or investigation by the person defamed to ascertain the existence, source, content

6  or meaning of a defamatory publication is not a defense to an action for its republication by the

7  defamer." *Comment d* to this section explains that this exception to the rule of Section 583 "has

8  no application when the inquiry is not an honest inquiry or investigation to ascertain the facts,

9  and the republication is invited only for the purpose of decoying the defendant into a lawsuit."

10  *Id.* § 584 cmt. d. The First Department of New York's Appellate Division has cited approvingly

11  both Section 583 and *comment d* to Section 584. *See LeBreton,* 680 N.Y.S.2d at 532.

12  Whether a republication of an earlier defamation is itself actionable when elicited by the

13  defamed party appears to turn in part on a combination of the defamed party's motivation for

14  eliciting the republication and the degree of certainty of the defamed party's expectation that the

15  statement elicited will be defamatory. Three precedents of three of New York's four Appellate

16  Divisions have found consent (and hence preclusion of suit based on the statement) in

17  circumstances where the defamed party elicited republication of the statement with a high degree

18  of certainty, based on information derived from prior experience, that the statement would be

19  defamatory. Thus the Third Department in *Dickson v. Slezak* found consent and consequent

20  preclusion where the plaintiff hired undercover investigators "to garner what he had *every*

21  *reason to anticipate would be defamatory* comments from defendants. " 902 N.Y.S.2d at 208

22  (emphasis added). The Second Department in *Handlin v. Burkhart* found consent and preclusion

14

**12-4437-cv**
**Sleepy's v. Select Comfort**

1 where "[i]n view of the [previous] meeting . . . at which the defendant . . . met with the plaintiff

2 . . . and two representatives from his union and detailed the reasons for [the plaintiff's] requested

3 resignation, [the plaintiff] *had every reason to anticipate* that the report delivered to the union

4 explaining the reasons for his discharge would be defamatory in nature." 632 N.Y.S.2d at 609

5 (emphasis added). The Fourth Department in *Park v. Lewis* likewise found consent where the

6 plaintiff essentially knew the statement elicited would be defamatory. The defendant had made

7 defamatory statements about the plaintiff during an earlier conversation with the plaintiff's

8 agents, and the plaintiff "instructed [his agents] to return to defendant's office to record

9 additional statements concerning plaintiff." *Park*, 528 N.Y.S.2d at 251.

10       On the other hand, the choice of words by which the Second and Fourth Departments

11 (but not the Third) have described the standard for determining whether there was consent to the

12 republication has suggested a less burdensome standard for the defendant to demonstrate the

13 plaintiff's consent. The Fourth Department stated in *Park* that consent is found if the plaintiff

14 has "*reason to anticipate* that [the] defendant's responses to [the] inquiries *might be*

15 defamatory." *Id.* (emphasis added). And the Second Department in *Handlin* quoted the same

16 standard, citing an earlier Fourth Department case. The Third Department in *Dickson*, however,

17 as stated above, appeared to base its ruling in favor of the defendant on the fact that the plaintiff

18 elicited the remarks having "*every reason to anticipate* [they] would be defamatory." *Dickson*,

19 902 N.Y.S.2d at 208 (emphasis added).

20       The provisions of the Restatement cited above place emphasis on the plaintiff's motive in

21 eliciting the statements from the defendant. There is, of course, a close relationship between the

22 degree of assurance the plaintiff possesses that the statements elicited from the defendant will be

15

**12-4437-cv**
**Sleepy's v. Select Comfort**

1    defamatory and the plaintiff's likely motive in eliciting them. The higher the degree of the

2    plaintiff's certainty that the defendant's statements will be defamatory, the less likely it is that

3    the plaintiff is eliciting them in an "honest inquiry or investigation to ascertain the facts," as

4    expressly condoned by Section 584, and the more likely it is that "the republication is invited

5    only for the purpose of decoying the defendant into a lawsuit," which precludes suit on the

6    elicited republication. Considering the scant and not-altogether-consistent New York case

7    authority entirely from lower courts, and the elucidation to be found in the Restatement, it

8    appears to us that New York's standard would be along the following lines: When a plaintiff

9    sues for defamation based on a statement of the defendant elicited by the plaintiff with some

10   reason to expect that the defendant's statement might be defamatory, the more the evidence

11   supports the proposition that the plaintiff elicited the statement with a high degree of certainty

12   that it would be defamatory, for the purpose of enabling a lawsuit, the stronger the defendant's

13   case for deeming the statement consented to, thus barring the claim. Otherwise put, the more the

14   evidence supports the proposition that the plaintiff elicited the statement, notwithstanding

15   awareness (but lacking certainty) that it might be defamatory, doing so as a good faith

16   investigation to determine whether in fact the defendant has been defaming the plaintiff (as the

17   plaintiff has reason to suspect), the weaker the defendant's case for deeming the defamation

18   consented to.

19        The district court based its decision on the question whether the alleged defamations of

20   Select Comfort salespersons elicited by Sleepy's secret shoppers were consented to, and thus not

21   actionable, primarily on whether it was Sleepy's agent or Select Comfort's salesperson who first

22   mentioned the fact that Sleepy's stores also sold Select Comfort merchandise. The district court

**12-4437-cv**
**Sleepy's v. Select Comfort**

1   also gave weight in favor of Select Comfort to evidence that Sleepy's instructed its secret

2   shoppers to ask about differences between Sleepy's and Select Comfort products and to "find out

3   whether or not [Select Comfort] would denigrate Sleepy's." *Sleepy's LLC*, No. 07-CV-4018, slip

4   op. at 18. We do not believe this was the proper analysis under New York's law. Accordingly,

5   we remand for reconsideration of whether these claims were barred by Sleepy's consent. To

6   justify a ruling either way on whether the specific statements of the Select Comfort salespersons

7   were consented to and thus not actionable, the court will need to make findings on the issues

8   outlined above as to whether Sleepy's inquiries were motivated by a good faith attempt to learn

9   whether the Select Comfort sales force was carrying on a consistent pattern of slander, or were

10  merely a ruse to decoy Select Comfort into a lawsuit, along with the closely related question

11  what was the degree of Sleepy's confidence or certainty at the time of each inquiry that such a

12  pattern of slander existed.[11]

13          We note further, however, that the inquiry into whether Sleepy's should be deemed to

14  have consented to the instances of alleged slander elicited by its secret shoppers may be of

15  limited importance. According to Sleepy's argument, the elicited statements had two purposes.

16  One was as actionable slanders. Their second, and perhaps more important, purpose was as

17  evidence demonstrating that Select Comfort's sales force had adopted *a pattern and practice* of

18  telling customers who inquired about the relative merits of purchasing Select Comfort's

---

[11] It is of course entirely possible that different instances of Sleepy's inquiries might call for different conclusions on this question. It is at least possible that the earlier instances of Sleepy's secret shopper program had a legitimate investigatory purpose whereas, by the time of the later ones, the existence of a defamatory campaign had been already so well established as to justify a conclusion that the later inquiries were motivated solely by the desire to generate further slanders for suit. Our mention of this possibility is not intended to suggest in any way that this is our view of the evidence. It is only to explain the possibility that, as an investigation progresses, the degree of certainty and the motivation for continuation can change.

1    merchandise from Sleepy's that the wooden foundations of the beds sold by Sleepy's were

2    defective and that Sleepy's did not honor its warranties. *Cf.* Fed. R. Evid. 406 ("Evidence of . . .

3    an organization's routine practice may be admitted to prove that on a particular occasion the . . .

4    organization acted in accordance with the habit or routine practice."). If Sleepy's succeeded

5    through this evidence of elicited statements in showing a pattern and practice in the Select

6    Comfort sales force of slandering Sleepy's, it might make little difference whether the elicited

7    statements could also serve individually as actionable slanders, because Sleepy's would have

8    shown that Select Comfort had committed numerous additional similar slanders that were not

9    solicited by Sleepy's. On remand, the district court should consider (a) whether Sleepy's

10   evidence of statements elicited from Select Comfort showed a pattern and practice on the part of

11   Select Comfort to make such defamatory statements to its customers, and, if so, (b) whether New

12   York law would sustain liability for the incidents of unsolicited slanders so demonstrated, *see*

13   *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 61-62 (2d Cir. 2002). If

14   so, this might effectively moot the inquiry whether under New York law the elicited statements

15   should be deemed consented to.

16          The judgment dismissing the slander claims is vacated and the matter remanded for

17   reconsideration whether Sleepy's should be deemed to have consented to the elicited statements

18   so as to bar claims of slander based on those statements, and for further consideration whether

19   Sleepy's, through those elicited statements, showed a pattern and practice in Select Comfort of

20   slandering Sleepy's.

1   **(b)     The Zaffron Claim**

2         We conclude in addition that the court's dismissal of the Zaffron claim was also based on

3   an incorrect understanding of New York law. This slander allegation was based on statements

4   made by Select Comfort during a secret shop conducted by Deborah Zaffron on November 5,

5   2006. Although the court found it could not rule as a matter of law that Sleepy's consented to

6   these statements because the Select Comfort salesperson was the first to mention Sleepy's, the

7   court granted judgment for Select Comfort on the grounds that the statements by the Select

8   Comfort salesperson were not actionable because they were "loose and hyperbolic" sales talk

9   that a reasonable listener would not believe to be conveying facts about Sleepy's. *Sleepy's LLC*,

10  No. 07-CV-4018, slip op. at 22 (internal quotation marks omitted). This ruling was error.

11        Under New York law, (with some exceptions) statements that do not purport to convey

12  *facts* about the plaintiff, but rather express certain kinds of *opinions* of the speaker, do not

13  constitute defamation. In determining whether a statement is actionable, "[t]he dispositive

14  inquiry . . . is whether a reasonable [listener] could have concluded that [the statements were]

15  conveying facts about the plaintiff." *Gross v. New York Times Co.*, 82 N.Y.2d 146, 152 (1993)

16  (internal quotation marks omitted). The statements are not actionable if a reasonable listener

17  would not understand them as assertions of fact. *Id.* at 153. Whether a statement can be

18  reasonably construed to assert a fact (and thus be actionable) is a question of law. *Id.* The Court

19  of Appeals has instructed that the inquiry calls for examination of "(1) whether the specific

20  language in issue has a precise meaning which is readily understood; (2) whether the statements

21  are capable of being proven true or false; and (3) whether either the full context of the

22  communication in which the statement appears or the broader social context and surrounding

19

**12-4437-cv**
**Sleepy's v. Select Comfort**

1  circumstances are such as to signal . . . listeners that what is being read or heard is likely to be

2  opinion, not fact." *Id.* (internal alterations and quotation marks omitted). Courts should begin the

3  analysis by looking to the "content of the whole communication, its tone and apparent purpose,"

4  *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 254 (1991), instead of engaging in

5  "hypertechnical parsing of written and spoken words for the purpose of identifying possible facts

6  that might form the basis of a sustainable [defamation] action," *Gross*, 82 N.Y.2d at 156

7  (internal alterations and quotation marks omitted).

8      The allegedly slanderous statements made during Zaffron's secret shop occurred during a

9  lengthy conversation between Zaffron and the salesman about Select Comfort's beds, pricing,

10  and terms of service, as well as the differences between Sleepy's and Select Comfort's models

11  and pricing policies. Zaffron had told the salesman that she bought a bed at Sleepy's but wanted

12  to replace it because it had become lumpy. The salesman, who had said he used to work at

13  Sleepy's and had left because he was "not wild about the way they did business," JA 1519, at

14  33:18-35, continued the conversation as follows:

15  Salesman:      Call [Sleepy's] up and you'll find out that Sleepy's will not honor [the
16                 warranty].

17  Zaffron:       No?

18  Salesman:      Absolutely not.

19  Zaffron:       How can they not honor it?

20  Salesman:      Because they'll send somebody out to your house, they'll inspect the bed,
21                 they'll say there's nothing wrong with it. Happens daily.

22  JA 1519, at 34:01-14.

1    This statement, viewed in the context of the conversation, conveyed defamatory facts

2  about Sleepy's business practices, and not merely non-actionable vague claims of superiority by

3  a competitor. The statement had a precise meaning, capable of being proven true or false – that

4  Sleepy's regularly, as a business practice, refuses to honor its warranty on defective

5  merchandise, justifying the refusal by the false assertion of an inspector that "there's nothing

6  wrong with" the defective merchandise. Especially coming from one who had worked at

7  Sleepy's but left because he did not like the way Sleepy's did business, the statement in context

8  would be understood as communicating a fact known by the speaker to be true. The statement

9  plainly attributed to Sleepy's a regular business practice of intentionally rejecting warranty

10  claims it knew to be justified based on dishonest inspection reports. We accordingly vacate the

11  judgment on this claim and remand for reconsideration.[12]

12  **IV.  Evidentiary Rulings**

13    Sleepy's challenges the district court's exclusion of two kinds of evidence offered by

14  Sleepy's at trial. Trial courts are allowed a measure of discretion in ruling on the admissibility of

15  evidence. *United States v. White*, 692 F.3d 235, 244 (2d Cir. 2012).

16    **(a)  Evidence of Customer State of Mind**

17    Through the testimony of four Sleepy's employees to whom the statements were made,

18  Sleepy's offered statements of four unidentified customers who sought to cancel the purchase of

19  Select Comfort beds. The customers said they wanted to cancel their purchases because of

---

[12] We note further that the district court applied an incorrect standard in considering whether the statements made to Zaffron were solicited. The court based its ruling on the fact that the Select Comfort salesperson was the first to mention Sleepy's. As noted above, which party first mentioned Sleepy's is not determinative. The court should reconsider the question of consent under the standards described above.

1   negative things they had been told by Select Comfort employees about Sleepy's. The district

2   court excluded these statements as hearsay. Sleepy's contends this was error. Although

3   acknowledging that the statements would be hearsay if offered to prove what Select Comfort

4   employees said to Sleepy's customers, Sleepy's argues that the statements were nonetheless

5   admissible as evidence of the customers' states of mind. Because slightly different factors bear

6   on each of these offers of evidence, we discuss each separately.

7         *(1) Scott Cheshul*

8        Sleepy's offered the testimony of Scott Cheshul, a Sleepy's employee, about an incident

9   in which a customer said he wanted to cancel a purchase because he was told by Select Comfort

10  that Sleepy's product was inferior. The district court ruled that this was inadmissible hearsay.

11  Sleepy's contends the customer's statement was admissible to show the customer's state of mind

12  – evidencing the customer's belief that the Select Comfort merchandise the customer had

13  purchased from Sleepy's was inferior.

14        We agree with Sleepy's argument. Although the statement was indeed inadmissible as

15  hearsay if offered to prove what Select Comfort personnel had said to the customer, it was

16  admissible evidence for the limited purpose of the customer's belief that the Select Comfort

17  merchandise sold by Sleepy's was inferior. *See Herman Schwabe, Inc. v. United Shoe Mach.*

18  *Corp.*, 297 F.2d 906, 914 (2d Cir. 1962) (Friendly, J.). Thus, while Sleepy's could not use this

19  evidence to show that Select Comfort was responsible for the customer's beliefs, the evidence

20  was nonetheless competent to show that Sleepy's was harmed by Select Comfort's conduct if it

**12-4437-cv**
**Sleepy's v. Select Comfort**

1   had other evidence to demonstrate that the customer's belief was attributable to Select

2   Comfort.[13]

3                  *(2) Tyler Paiva*

4        Sleepy's offered the testimony of its employee, Tyler Paiva, regarding incidents in which

5   two customers said they wanted to cancel their purchases from Sleepy's of Select Comfort beds

6   because they were told by Select Comfort that Sleepy's carried an inferior bed foundation and

7   that the warranty given by Sleepy's was not effective. The district court excluded Paiva's

8   testimony as hearsay because Paiva did not identify the customers.

9        While there might well have been justifications for excluding this evidence, including

10   perhaps the absence of competent evidence linking these customers' beliefs to conduct of Select

11   Comfort, Sleepy's inability to identify the customers whose states of mind were at issue did not

12   render the evidence hearsay on that point. *See Callahan v. A.E.V., Inc.*, 182 F.3d 237, 252 n.11

13   (3d Cir. 1999).

---

[13] We note Judge Friendly's comment in *Herman Schwabe, Inc.,* that

> the trial judge should have some discretion in view of the risk of insincerity in a
> potential customer's statement why products were not being ordered. It should not
> be forgotten that the basis for admitting statements of mental or physical
> condition even from declarants not unavailable, is that later testimonial utterances
> 'where there is ample opportunity for deliberate misrepresentation and small
> means for checking it by other evidence or testing it by cross-examination, are
> comparatively inferior to statements made at times when circumstances lessened
> the possible inducement to misrepresentation,' 6 Wigmore, Evidence (3 ed.
> 1940), p. 58; it may be doubted how fully these considerations apply to
> statements of the sort under review.

297 F.2d at 914 n.10. In the present instance, so far as the record reveals, the exclusion was not a
discretionary ruling based on such an appraisal of risk of insincerity in the particular
circumstances.

1          *(3) Deborah Zaffron testimony*

2          Sleepy's sought to introduce the testimony of its former employee Deborah Zaffron

3    about a customer who wanted to cancel his purchase of Select Comfort merchandise from

4    Sleepy's because he was told by Select Comfort that "what [Sleepy's] w[as] selling was not a

5    Select Comfort." JA 431.5. When Sleepy's first began this line of testimony, Select Comfort

6    objected on hearsay grounds and sought to exclude the testimony if Zaffron could not identify

7    the customer by name. In response to Select Comfort's hearsay objection, Sleepy's argued that

8    Zaffron's testimony was admissible as evidence of the customer's state of mind.

9          The district court's ruling on admissibility of the evidence is somewhat unclear. The

10   court stated that if Zaffron could not identify the customer, the court would strike the testimony.

11   When Zaffron testified specifically about what the customer told her regarding his reasons for

12   wanting to cancel his Sleepy's purchase, and Select Comfort again objected on hearsay grounds,

13   the court responded, "No, I'll allow it. I'm not saying the truth of it, the reason why she did what

14   she did." JA 431.5. It is not clear who was the "she" whose reasons the court referred to. If, in so

15   saying, the court was receiving the evidence for the limited purpose of showing the customer's

16   reasons for returning the bed, we believe it was a correct ruling. On the other hand, because the

17   customer was male, it is possible that the court was receiving the testimony solely to show

18   Deborah Zaffron's reasons "why she did what she did." In any event, it makes no difference for

19   our present purposes whether the court's ruling was correct or incorrect as the matter is being

20   returned for reconsideration. Upon remand, the court should consider Zaffron's testimony as to

21   what the customer said about his reasons for wanting to cancel his purchase as competent,

22   nonhearsay evidence of the customer's state of mind, i.e., his beliefs about the merchandise and

24

1  Sleepy's, while at the same time it is inadmissible hearsay which is not competent to establish

2  what was said to him by Select Comfort.

3        Zaffron's testimony about this incident continued. She testified that in hopes of saving

4  the sale from cancellation she placed a call to Select Comfort on the speaker phone with the

5  customer listening and asked the Select Comfort employee who responded about differences

6  between Sleepy's and Select Comfort products. According to Zaffron, the Select Comfort

7  employee said a series of negative things about Sleepy's, the quality of Sleepy's products, and its

8  warranties. Zaffron further testified that, after that phone conversation, she was unable to prevent

9  the customer from cancelling his purchase. We see no reason why this evidence was not

10  admissible at least to show disparagement in breach of contract, and perhaps for other purposes

11  as well.

12               *(4) James Constantinides testimony*

13        Sleepy's employee James Constantinides testified that he spoke to a customer who

14  wanted to cancel his sale because the customer was told by a Select Comfort employee that

15  Select Comfort's bed foundation was superior to Sleepy's bed foundation. The district court

16  allowed the testimony for the limited purpose of explaining Constantinides's subsequent actions,

17  but ruled that the testimony was otherwise inadmissible hearsay.

18        During Constantinides's testimony, Sleepy's counsel failed to argue that the testimony

19  was admissible as evidence of the customer's state of mind. While counsel should have apprised

20  the court of its argument in support of the testimony's admissibility, given that the district court

21  will be reconsidering the trial evidence on remand, the court should similarly consider

1    Constantinides's testimony of the customer's reasons for wanting to cancel his Sleepy's

2    purchase.

3    **(b)    Exclusion of Shop Recordings**

4    Sleepy's asserts that the district court erred in refusing to admit into evidence 7 of the 15

5    secret shop recordings that Sleepy's offered during trial. For several of these recordings, it

6    appears the district court either reserved decision on whether to admit the recording or stated that

7    the court was not admitting the recording until the court resolved the issue of possible evidence

8    spoliation that Select Comfort had raised in several motions before the court. At the time the

9    court entered judgment on partial findings for Select Comfort, the court had not yet issued a

10   definitive ruling on Select Comfort's spoliation motion. We leave it to the district court to

11   consider that issue, and the consequent admissibility of the relevant shop recordings, on remand.

12   Select Comfort argues that the shop recordings that have not been admitted are

13   inadmissible because Sleepy's witnesses were unable to testify about the chain of custody of the

14   recordings and therefore did not sufficiently establish the recordings' authenticity. This

15   argument has no merit. Sleepy's can authenticate the tapes without providing chain-of-custody

16   evidence. *See United States v. Tropeano*, 252 F.3d 653, 661 (2d Cir. 2001). In this case, for each

17   recording, the Sleepy's witness authenticating the recording testified that (1) the witness

18   recognized his or her own voice and the voice of the Select Comfort employee with whom the

19   witness conversed and (2) the recording accurately reflected the witness's conversation with the

20   Select Comfort employee. A tape recording of a conversation may be authenticated by

21   participants in the conversation. *See United States v. Hamilton*, 334 F.3d 170, 187 (2d Cir.

22   2003). In order to authenticate the tapes, Sleepy's was not required to provide evidence of chain

**12-4437-cv**
**Sleepy's v. Select Comfort**

1    of custody. To the extent the district court excluded any of the recordings on the grounds that

2    Sleepy's had not established chain of custody, that was error.[14]

3                           **CONCLUSION**

4         For the reasons stated above, the district court's judgment is AFFIRMED in part and

5    VACATED in part. The case is remanded to the district court for further proceedings consistent

6    with this opinion.[15]

---

[14] As noted, the recordings may still have been inadmissible for reasons relating to Select Comfort's assertions of evidence spoliation. We do not here conclude that the recordings in question were in fact admissible.

[15] Select Comfort asks this Court to affirm the district court's judgment in its entirety on the grounds that Sleepy's failed to prove causation and damages. These issues remain open on remand.